# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| North American Science Associates, LLC, *an Ohio limited liability company also known as NAMSA*, and NAMSA Holdco, LLC, *a Delaware limited liability company*, | Case No. 24-cv-0287 (JWB/ECW) |
| Plaintiffs, | |
| v. | **ORDER** |
| Michael Conforti, Pamela Conforti, and Phoenix Preclinical Labs, LLC, *a Minnesota limited liability company*, | |
| Defendants. | |

---

This case is before the Court on Plaintiffs North American Science Associates, LLC and NAMSA Holdco, LLC's "Motion to Compel Discovery and Preclude Defendants from Asserting the Marital Communications Privilege as a Sword and a Sheild [sic]." (Dkt. 126.)  For the reasons stated below, the Motion is denied.

## I.      BACKGROUND

### A.      Factual and Procedural Background

On February 2, 2024, Plaintiff North American Science Associates, LLC filed this action against Defendants Michael Conforti, Pamela Conforti, and Phoenix Preclinical Labs, LLC (collectively, "Defendants") alleging misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; breaches of confidentiality

agreements; and commercial defamation, and also filed a Motion for a Temporary Restraining Order and Preliminary Injunction.  (*See generally* Dkts. 1, 23.)  On February 5, 2024, U.S. District Judge Jerry W. Blackwell held a status conference (Dkt. 46), decided to treat that Motion "as a motion for a preliminary injunction, rather than a motion for a temporary restraining order" (*see* Dkt. 54 ¶ 1), and ordered "expedited discovery [relating to the preliminary injunction motion] that is limited to readily accessible documents and information necessary to resolve Plaintiff's motion" (*id.* ¶ 2).

On February 28, 2024, the Court entered a scheduling order as to the expedited discovery and set deadlines relating to an amended motion for preliminary injunction. (Dkt. 80.)  The Order set an April 19, 2024 close of expedited discovery; an April 22, 2024 deadline to seek relief concerning expedited discovery, and an April 26, 2024 deadline for the amended motion for preliminary injunction.  (*Id.* at 2.)[1]  The parties later stipulated to the consolidation of North American Science Associates, LLC's action against Defendants in this District with an action filed by North American Science Associates, LLC and NAMSA Holdco, LLC (collectively, "NAMSA") against Defendant Michael Conforti in the District of Delaware (which had been transferred to this District) (Dkt. 81), and the Court consolidated the cases on March 7, 2024 (Dkt. 89).

At the Court's direction, the parties filed an Amended Complaint reflecting the consolidation on March 13, 2024.  (Dkts. 89, 97.)  Defendants Pamela Conforti and Phoenix Preclinical Labs, LLC ("Phoenix Preclinical") filed an Answer and

---

[1]     Unless otherwise stated, page citations to the docket are to the CM/ECF pagination.

Counterclaims for defamation and unfair competition against North American Science Associates, LLC on April 3, 2024 (Dkt. 118) and Defendant Michael Conforti also filed his Answer on April 3, 2024 (Dkt. 119).  Defendants Pamela Conforti and Phoenix Preclinical filed an Answer and Amended Counterclaims on April 24, 2024.  (Dkt. 142.)

Meanwhile, the parties proceeded with expedited discovery and the Court resolved discovery disputes through informal dispute resolution ("IDR") four times between February 28, 2024 and April 30, 2024.  (*See* Dkts. 88, 106, 121, 191.)  NAMSA filed the instant Motion on April 22, 2024.  (Dkt. 126.)  On April 26, 2024, NAMSA filed its Amended Motion for Preliminary Injunction (Dkt. 160) along with a Motion for Sanctions against Defendants Michael Conforti and Pamela Conforti for Evidence Spoliation (Dkt. 151).  Most recently, on May 29, 2024, NAMSA filed a Motion to Dismiss Defendants/Counterclaimants Pamela Conforti's and Phoenix Preclinical Labs, LLC's Amended Counterclaims.[2]  (Dkt. 279.)

In the Motion at issue here, NAMSA moves to preclude Defendants from asserting the marital communications privilege as a sword and a shield.  (Dkt. 126.)  In its brief, NAMSA first argued that "the Confortis tried to selectively waive the marital communications privilege while simultaneously invoking it to conceal relevant communications and facts," that is, the Confortis (who are married) are "using their marital communications as a sword when it suits them" but otherwise "raise the privilege

---

[2]     Although NAMSA filed this Motion during the expedited discovery period and has since filed its Amended Motion for Preliminary Injunction (Dkt. 160), the issues raised by the Motion are not moot given that discovery is ongoing (*see* Dkt. 196 at 3 (setting November 1, 2024 fact discovery deadline)).

as a shield." (Dkt. 128 at 3, 14; *see generally id.* at 14-19.) NAMSA's second argument was that Defendants waived any potentially applicable marital communications privilege over communications made through their business email accounts, specifically their sent and received emails while working for NAMSA's predecessor American Preclinical Services ("APS"), which was founded by the Confortis and purchased by NAMSA in 2021; emails sent and received via IT systems and business accounts at the Confortis' "separate business, FlexSchema"; and emails sent and received over Pamela Conforti's Phoenix Preclinical account. (*Id.* at 2, 4-5, 19-22.) Third, NAMSA asked the Court to recognize and apply "a 'business affairs' exception to the narrowly construed marital communications privilege." (*Id.* at 2, 22-24.) NAMSA also proposed a set of search terms in an appendix to its brief and asked the Court to require Defendants to run those terms and produce documents that hit on those terms. (*Id.* at 19, 24, 27-28.)

Defendants oppose the Motion. (*See* Dkt. 188.) Defendants argue they have properly invoked the privilege within the scope of a waiver agreed to by NAMSA and they have not used the privilege as a sword and a shield. (*Id.* at 18-21.) Defendants also argue that their APS emails dated from before NAMSA acquired APS in 2021 and their FlexSchema emails are not relevant, and that they did not waive privilege by communicating using email accounts belonging to companies they owned, founded, and operated. (*Id.* at 21-27.) Finally, Defendants argue that "[t]he business-affairs exception is not recognized in Minnesota, the Eighth Circuit, or the District of Minnesota," the Court should not recognize it here, and even if the Court did recognize it, NAMSA has not shown the exception applies to the communications at issue. (*Id.* at 27-31.)

4

The Court held a hearing on the Motion on May 9, 2024.  (Dkt. 202.)  This hearing clarified the issues raised by the Motion, and the Court will address the parties' oral argument in the discussion below.  However, before turning to the specific arguments, the Court highlights three additional facts in this section.

First, on April 5, 2024, Defendants Michael Conforti and Pamela Conforti agreed to waive the marital communications privilege (also referred to as the "spousal privilege" or "marital privilege") for three categories of communications between them: those (a) "regarding alleged 'spoliation' of evidence up to and including the date and time it allegedly occurred with respect to that specific alleged 'spoliation'"; (b) "regarding the funding, founding, creation, organization, and operation of Phoenix [Preclinical]"; and (c) "the alleged taking of NAMSA's proprietary information or trade secrets, or the alleged exchange of that proprietary information or trade secrets between Ms. Conforti and Dr. Conforti" in exchange for NAMSA's agreement that this waiver, "standing alone, does not constitute a broader waiver of the spousal privilege generally."  (Dkt. 130-3 at 5-6; Dkt. 130-7 at 2.)  The Court refers to the parties' agreement as the "Waiver Agreement."  When NAMSA entered into the Waiver Agreement, it also "reserve[d] its right to challenge all assertions of privilege, including spousal privilege."  (Dkt. 130-7 at 2.)

Second, Defendants have represented that they withheld documents consistent with the scope of this Waiver Agreement.  (Dkt. 188 at 13 ("Ms. Conforti and Phoenix Preclinical did not withhold and log otherwise maritally privileged documents that fall within the three enumerated categories of communications central to NAMSA's claims in

this dispute."); *id.* at 14 ("Dr. Conforti did not withhold and log otherwise maritally-privileged documents that fall within the three enumerated categories of communications central to NAMSA's claims in this dispute.").)  As NAMSA relied on Defendants' privilege logs to support the Motion, the Court will clarify certain aspects of the privilege logs.  Pamela Conforti and Phoenix Preclinical produced two privilege logs in this case: a "logic image privilege log," which they state contained logged documents "regardless of whether they were responsive to NAMSA's document requests" because the logic image "was produced irrespective of the relevancy of the contents" due to the demands of expedited discovery.  (Dkt. 188 at 11-12.)  This logic image privilege log is attached as Exhibit 7 to the Declaration of Shannon Lankenau ("Lankenau Declaration").  (Dkt. 130-4.)  They later produced a "traditional privilege log," which identified Pamela Conforti and Phoenix Preclinical's "responsive and privileged documents."  (Dkt. 188 at 12.)  This traditional privilege log is attached as Exhibit 8 to the Lankenau Declaration.  (Dkt. 130-5.)  Pamela Conforti and Phoenix Preclinical stated: "if a document is not on the 'Traditional Privilege Log' it is not responsive to NAMSA's First Set of Requests for Production."  (Dkt. 188 at 12.)

Michael Conforti produced only a "traditional privilege log."  (*Id.* at 13-14.)  His traditional privilege log is attached as Exhibit 9 to the Lankenau Declaration.  (Dkt. 130-6.)  For purposes of this Motion, the Court focuses on the traditional privilege logs for two reasons.  First, Defendants have represented that those logs identified documents that are responsive to NAMSA's discovery and were withheld on privilege grounds.  Second, NAMSA has not offered any evidence calling into question Pamela Conforti and Phoenix

Preclinical's distinction between their logic image privilege log and their traditional privilege log.  Although NAMSA commented on the number of entries and the sufficiency of the privilege logs (*see* Dkt. 128 at 7-8), it did not seek relief with respect to the logs' sufficiency or specific documents (other than those discussed in this Order) when NAMSA filed its Motion.  Then, with the Court's permission, NAMSA did make post-hearing arguments regarding Defendants' amended traditional privilege logs (Dkts. 213, 214), to which Defendants responded (Dkt. 278).  The Court addresses those arguments in Section III.E, *infra*.

Third and finally, there are several important points regarding the APS, FlexSchema, and Phoenix Preclinical email accounts.  Counsel for Pamela Conforti and Phoenix Preclinical represented to the Court at the May 9, 2024 hearing that they were not withholding any responsive documents from Phoenix Preclinical email accounts on the basis of marital privilege.  (Dkt. 202 at 66:13-21.)[3]  Counsel also represented that no responsive documents were withheld from the FlexSchema email accounts on the basis of marital privilege.  (*Id.* at 62:12-63:20.)  Finally, NAMSA confirmed at the hearing that NAMSA owns and possesses the APS email server and has already searched that email server for documents, including emails dating before NAMSA's acquisition of APS.  (*Id.* at 95:24-96:18.)

---

[3]     Citations to transcripts are in transcript page:line format.

## II.    LEGAL STANDARD

As a starting point, discovery in civil cases is limited to nonprivileged matters that are relevant to any party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).  Rule 26(b) further limits the scope to discovery that is:

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Id.*

As to the law governing the marital communications privilege, the parties disagree as to whether federal or state law controls the issues raised by this Motion.  NAMSA asserts claims under federal and state law against Defendants.  "Federal common law applies to the issue of privilege where subject matter jurisdiction is premised on a federal question, whereas state law applies to the issue of the attorney-client privilege when the subject matter jurisdiction is based on diversity."  *Sanimax USA, LLC v. City of S. St. Paul*, No. 20-CV-1210 SRN/ECW, 2021 WL 4846364, at *7 n.2 (D. Minn. Oct. 18, 2021) (citing Fed. R. Evid. 501; *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir.), *cert. denied*, 484 U.S. 917 (1987); *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *5 (D. Minn. Apr. 1, 2014)), *modified sub nom.*, 2021 WL 5769309 (D. Minn. Dec. 6, 2021).  "Where there are both state and federal claims, if the evidence sought is only relevant to the state claims, then state law applies; however, if the evidence sought is relevant to both the state and federal claims, then federal common law applies."  *Sanimax*, 2021 WL 4846364, at *7 n.2 (citations

8

omitted).  NAMSA argues that federal law applies because the scope of the Confortis' waiver includes documents relating to NAMSA's federal trade secret claims.  (Dkt. 128 at 12-13; Dkt. 202 at 42:21-25.)  Defendants argue that state law applies because the documents implicated by the Motion "are exclusively related to Dr. Conforti's involvement in Phoenix Preclinical, not to any alleged trade secret violations"—but also says the distinction between federal and Minnesota law does not matter.  (Dkt. 202 at 69:4-24; Dkt. 188 at 16-18.)

Under federal common law, the marital communications privilege protects "confidential communications arising from the marital relationship."  *See United States v. White Owl*, 39 F.4th 527, 530 (8th Cir. 2022) (quoting *United States v. Allery*, 526 F.2d 1362, 1365 (8th Cir. 1975)).  "The basis of the immunity given to communications between [spouses] is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."  *Wolfle v. United States*, 291 U.S. 7, 14 (1934) (citations omitted).  Under Minnesota law, the marital communications privilege applies "to any communication made by one to the other during the marriage," subject to exceptions not relevant here.  Minn. Stat. Ann. § 595.02(a).  Notwithstanding the parties' dispute over whether federal or state law applies, the Court need not decide this issue because the Court would reach the same conclusion as to the Motion under federal or Minnesota law.

As to a party's reliance on an evidentiary privilege such as the marital communications privilege, principles of fairness preclude a party "from simultaneously

using the privilege as both a sword and a shield; that is, it prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (attorney client privilege), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016); *see also United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) (holding that "[t]he attorney client privilege cannot be used as both a shield and a sword").  Under Minnesota law:

> The owner of the privilege of preventing the disclosure of confidential communications cannot, after testifying to or about them, or to or about any substantial part of them, without claiming his privilege, or objecting to testify on the ground of his privilege, invoke that privilege to prevent other parties to the communications from testifying to them. He cannot by his silence lay down the shield of his privilege, and assail another with the sword of his own testimony to the privileged communications, and, when his adversary essays to defend himself, or to attack him by his version of the testimony, or by the testimony of other parties or witnesses to such communications, again seize the shield of his privilege and shut out all testimony as to the confidential communications but his own. He has waived his privilege and "such waiver is in no sense contrary to public policy; indeed, it is in the interest of truth and justice."

*Swanson v. Domning*, 86 N.W.2d 716, 722-23 (Minn. 1957) (quoting *Kelly v. Cummens*, 121 N.W. 540, 542 (Iowa 1909)).

## III.   ANALYSIS

The Court first addresses NAMSA's sword/shield argument, including whether NAMSA is estopped from making this argument based on the Waiver Agreement and whether NAMSA has identified specific instances where Defendants' conduct should result in a finding of waiver.  The Court then addresses NAMSA's arguments relating to communications sent on APS, FlexSchema, and Phoenix Preclinical servers, including

those relating to the Confortis' reasonable expectation of privacy in such communications and whether the Court should adopt the "business affairs" exception to the marital communications privilege.

## A.    NAMSA Cannot Seek a Broader Waiver Based Only on the Waiver Agreement

The Court begins with the threshold issue of whether, as Defendants argue, judicial estoppel preludes NAMSA's sword/shield argument.  (*See* Dkt. 188 at 18.)  "The doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation."  *United States ex rel. Gebert v. Transp. Admin. Servs.*, 260 F.3d 909, 917 (8th Cir. 2001) (quoting *Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir. 1998)).

NAMSA's brief led with the following sword/shield argument:

First off, there is no real question that Defendants' waiver is partial and selective. They waived the privilege on three narrow points and no others, while invoking it to withhold thousands of potentially relevant documents and testimony. First, they waived it as to "[a]ny spousal communication regarding alleged 'spoliation' of evidence up to and including the date and time it allegedly occurred with respect to that specific alleged 'spoliation.'" This would leave the Confortis free to claim they never discussed or planned the destruction of troves of relevant evidence before it happened, while simultaneously concealing all of their communications about such serious conduct afterwards. Second, they waived the privilege as to "[a]ny spousal communications regarding the funding, founding, creation, organization, and operation of Phoenix." This would leave them free to claim they purportedly never "substantively" communicated about those five specific topics, while concealing all communications about other aspects of this competitive, not-yet-operational business (e.g., planning, promoting, or supporting it, or interacting with other businesses or potential partners about it). Finally, Defendants waived their privilege as to "[a]ny spousal communications regarding the alleged taking of NAMSA's proprietary information or trade secrets, or the alleged exchange of that proprietary information or trade secrets between Ms. Conforti and Dr. Conforti." This waiver on

communications about "taking" or "exchanging" NAMSA's proprietary information would still permit Defendants to conceal communications about other illicit uses of proprietary information, such as copying, exploiting, disclosing, maintaining, deleting, or otherwise interacting with it."

Courts in the Eighth Circuit reject litigants' attempts to selectively waive other privileges, and these cases are highly instructive. . . . The same principle applies here: the Confortis needed to choose a single course of action, waiving any applicable privilege over their communications about the facts of this lawsuit, or invoking it and staying silent on those topics. The law does not entitle them to do both.

(Dkt. 128 at 15-16.)[4]  Based on these arguments, the Court reads NAMSA's brief as

seeking a broader waiver because NAMSA viewed the scope of Defendants' agreed-to

waiver in the Waiver Agreement as selective and unfair.

Further confirming NAMSA's focus on the Waiver Agreement as a basis for a

broader waiver, NAMSA also argued:

The Confortis have attempted to selectively waive the privilege over specific and limited communications about (1) the spoliation of evidence, (2) the newly created [contract research organization] Phoenix, and (3) their acts of misappropriation. Partially waiving the privilege on these select topics has enabled them deny [sic] having had any real interaction with one another about them, while concealing thousands of communications that may shed light on those claims, and refusing to testify about the topics more generally.

This sword-and-shield strategy is improper. NAMSA should not be forced to accept Defendants' bald, self-serving assertions at face value, such as their claims that Dr. Conforti has had no meaningful or substantive involvement in the new competitive [contract research organization]. NAMSA is entitled to discover the withheld communications about such key issues in the case and question the witnesses on them without restriction. Respectfully, the Court should reject Defendants' attempts at selective waiver and order the

---

[4]     NAMSA acknowledged (in a footnote) that it "was willing to agree that Defendants' waivers on certain topics 'standing alone, d[id] not constitute a broader waiver of the spousal privilege generally.'"  (*Id.* at 7 n.5.)  In that footnote, NAMSA noted its reservation of rights "to challenge all assertions of privilege, including spousal privilege, as it is doing in this motion."  (*Id.*)

production of all documents and communications improperly withheld under the marital communications privilege that relate to the subject matter of Defendants' categorial "selective" waiver or to the issues in this lawsuit generally so that NAMSA can assess the veracity of Defendants' conclusory claims and follow up with depositions if it deems necessary.

(*Id.* at 18.)

Based on these and similar passages, NAMSA's primary argument in its brief appears to be that Defendants' waiver on the "three narrow points" requires a finding of waiver over all communications protected by the marital privilege. If this argument is what NAMSA intended, NAMSA's conduct would constitute a troubling violation of the Waiver Agreement. Indeed, Defendants raised this concern in their brief, invoking judicial estoppel to preclude NAMSA from relying on the Waiver Agreement to seek a broader waiver. (Dkt. 188 at 18.)

Nevertheless, NAMSA at times during the hearing still appeared to be relying on the Waiver Agreement to seek a broader waiver, while simultaneously denying it was violating that Agreement. For example, NAMSA apparently disagreed with the date Defendants selected as the cut-off for waiver as to the alleged spoliation, and therefore took the position that it could seek a broader waiver (notwithstanding the Waiver Agreement) because the way the testimony came in was not what NAMSA expected. (*See* Dkt. 202 at 10:12-11:13 (arguing that date cut-off for spoliation was "not in the spirit of what's permitted by selective waiver"); *id.* at 12:6-12 (arguing that it did not violate the Waiver Agreement to contend that the Confortis' waiver up to the date of the alleged spoliation required waiver after that date because NAMSA does not believe "the waiver stood alone, and what I mean by that is that we didn't expect, we didn't

understand and, frankly, couldn't have predicted how the testimony would come out on some topics and then be halted").)

The Court rejects NAMSA's broad claims of sword/shield-based waiver. NAMSA agreed that it would not rely on Defendants' waiver of the spousal privilege as to three topics, "standing alone," to seek a broader waiver of the privilege. (Dkt. 130-10 at 2.) To the extent NAMSA seeks a finding of broader waiver based on Defendants' waiver as to those three points—and nothing more—NAMSA is violating the Waiver Agreement. However, the Court is not persuaded that the doctrine of judicial estoppel applies, as "[t]he underlying purpose [of judicial estoppel] is to protect the judicial process." *Amtrust Inc. v. Larson*, 388 F.3d 594, 600 (8th Cir. 2004); *see also id.* ("The doctrine of judicial estoppel prevents a party from taking a position during litigation which is contrary to one taken in a prior judicial or quasi-judicial proceeding."). As noted in Wright & Miller, "[s]everal cases distinguish the equitable estoppel theory from a broader theory of judicial estoppel by noting that equitable estoppel requires reliance by a party, while judicial estoppel requires reliance by a tribunal." 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4477.2 (3d ed.). Here, no court has previously relied on the Waiver Agreement, nor was it previously presented to the Court (or any other court), calling into question the applicability of judicial estoppel.

But whether judicial estoppel applies does not matter, because the Court need not rely on that doctrine to reject any attempt by NAMSA to use Defendants' waiver on the three agreed-upon points to seek a broader scope of waiver. The Court need only hold NAMSA to the Waiver Agreement. "It is essential to our system of justice that lawyers

and litigants, above all, abide by their agreements and live up to their own expectations." *In re Bristol-Myers Squibb Sec. Litig.*, 205 F.R.D. 437, 444 (D.N.J. 2002). The Court expects NAMSA to abide by the Waiver Agreement and, if NAMSA will not do so of its own volition, the Court will enforce that agreement, especially considering the interests protected by the marital privilege.[5] Consequently, the Court declines to find a broad waiver based on Defendants' decision to waive the marital privilege as to the three points as set forth in the Waiver Agreement. Doing so would unfairly reward NAMSA for making (and then breaking) the Waiver Agreement. To the extent NAMSA seeks a broader waiver because it is unhappy with the results or scope of the Waiver Agreement, that makes no difference. The Waiver Agreement was not conditioned on NAMSA's satisfaction with its results and NAMSA never sought a different scope, including a different cut-off date for the waiver as to alleged spoliation, before making the Waiver Agreement. The Court rejects any attempt by NAMSA to walk back the Waiver Agreement.[6]

---

[5]   Because NAMSA entered into the Waiver Agreement, none of its selective waiver cases are persuasive to the extent NAMSA seeks any relief that would undermine that Agreement.

[6]   Relying on interrogatory responses and certain testimony, NAMSA argues that statements that Michael Conforti had "no real involvement" and "was not involved in any substantive way" with the creation, formation, establishment, or business operations of Phoenix Preclinical, or its design, operations, creating any business relevant materials including controlled documents, financing, working with vendors or suppliers, etc., are a waiver of the marital communications privilege. (*See* Dkt. 128 at 3 & n.1.) NAMSA then later described the Confortis as stating their "communications" were not "substantive" or "real." (*Id.* at 14 ("It would be manifestly unfair to permit Defendants to continue using their marital communications as a sword when it suits them (*e.g.*,

**B.     NAMSA's Deposition-Based Sword/Shield Arguments**

The Court turns to NAMSA's second sword/shield argument, which is that the parties disagree as to the scope of the Waiver Agreement.  (Dkt. 202 at 9:3-20 (stating that NAMSA's sword/shield arguments were based on "an interpretation of those topics" while its email communications arguments were based on "broader waivers").)  NAMSA identified specific instances of instructions not to answer during the Confortis' depositions and assertions of privilege over certain exhibits to support this argument. (Dkt. 128 at 8-12 (describing specific instances).)  Defendants argue that waiver should not be found because these instances were simply misunderstandings that often occur during depositions and that, to the extent Defendants later withdrew assertions of privilege as to certain documents that NAMSA tried to use during depositions, they already agreed to reopen the deposition or offer a declaration as to those exhibits.  (Dkt. 188 at 18-21, 26-27.)

---

describing their communications as limited, not 'substantive' or 'real' . . . ."); *id.* at 15 ("This would leave them free to claim they purportedly never 'substantively' communicated about those five specific topics, while concealing all communications about other aspects of this competitive, not yet operational business . . . .") (emphases removed).)  NAMSA's latter statements are somewhat imprecise.  There is a distinction between "involvement" to the extent it constitutes conduct outside of communications, such as analyzing potential sites (*e.g.*, Dkt. 133 at 141:1-5), forming an entity, creating materials, etc., and communications between spouses about such conduct.  For purposes of this Motion, the Court focuses on the Confortis' communications and their testimony about those communications, because it is communications that are protected by the privilege.

### 1.    Pamela Conforti's Deposition and Exhibits

The Court begins with Pamela Conforti's deposition.  As background, Pamela Conforti asserts she became interested in becoming a landlord in the spring of 2023 and formed a single member LLC, Phoenix Investments, in her own name to do so, eventually purchasing a building in Coon Rapids, Minnesota.  (Dkt. 133 at 122:19-24, 125:22-126:10.)  Pamela Conforti testified that Phoenix Investments purchased the Coon Rapids building before she decided to form Phoenix Preclinical.  (*Id.* at 123:4-8, 125:1-12.)  She incorporated Phoenix Preclinical in September 2023, apparently after a meeting with NAMSA in August 2023 "where she felt slighted by NAMSA"; demolition work began on the Phoenix Investments building in October 2023; and construction began on the building in January 2024.  (*Id.* at 126:19-127:7; *see id.* Dkt. 202 at 73:3-8 (counsel describing August 2023 meeting).)

When asked what role, if any, Michael Conforti played in her consideration and selection of potential facilities or properties to purchase, Pamela Conforti testified that his only role was as "a spouse sounding board" and that "he was not influencing [her] or participating in the analysis or any type of the decision-making."  (Dkt. 133 at 140:7-141:4.)  After that testimony, Pamela Conforti's counsel set forth the scope of the Waiver Agreement on the record and, when NAMSA's counsel asked how Michael Conforti acted as a "sounding board," Pamela Conforti's counsel instructed her not to answer if she thought the answer fell outside of the funding, founding, creation, organization, and operation of Phoenix Preclinical.  (*Id.* at 141:9-146:8.)  Ms. Conforti declined to answer because the question "relate[d] to the purchase of the building as it is outside the

founding of and operation of Phoenix, which is defined as Phoenix Preclinical Labs."
(*Id.* at 146:9-13.)  NAMSA now argues that these topics were "well within the scope of
the waiver that the defendants had offered" but NAMSA was not able to explore them
because Ms. Conforti would not answer the questions and counsel instructed her not to
answer them.  (Dkt. 202 at 14:2-17; *see also* Dkt. 128 at 8-9 (taking issue with Ms.
Conforti's "unilateral assessment that the questioning fell outside the narrow scope of her
selective waiver").)  According to NAMSA, Pamela Conforti's testimony about the
selection of the facility purchased by Phoenix Investments, her knowledge that it could be
equipped for a life sciences laboratory that would compete with NAMSA, and her use of
Michael Conforti as a non-influential sounding board falls within the scope of paragraphs
2 and 3 of the Waiver Agreement.  (Dkt. 202 at 16:20-17:18.)

Paragraph 2 of the Waiver Agreement is a waiver of "[a]ny spousal
communications regarding the funding, founding, creation, organization, and operation of
Phoenix Preclinical."  (Dkt. 130-3 at 5.)  At the hearing, NAMSA acknowledged that
paragraph 2 of the Waiver Agreement did not encompass Phoenix Investments.  (Dkt.
202 at 12:21-13:9.)  Nevertheless, NAMSA asserts that the questions at issue "relate[d] to
things such as the operation of Phoenix Preclinical Labs at that site."  (*Id.* at 15:1-2.)
NAMSA contends that "the facts are so intertwined as to be inseparable" such that the
scope of paragraph 2 "includes any steps the defendants took related to creating or
organizing or operating Phoenix, including steps they may have taken through other
entities to provide the very specialized facilities that Phoenix Preclinical Laboratories
would need."  (*Id.* at 18:1-20, 20:9-15.)

NAMSA's argument ignores the difference between Phoenix Investments and Phoenix Preclinical, the unrebutted testimony that Pamela Conforti started Phoenix Investments and began looking at properties before she decided to form Phoenix Preclinical, and the distinction between purchasing a property for use as landlord and starting the Phoenix Preclinical contract research organization. The link between conversations about Pamela Conforti's selection of a facility to purchase so Phoenix Investments could be a landlord and Pamela Conforti's decision months later to start Phoenix Preclinical is simply too attenuated for the Court to find conversations about Phoenix Investment's facility selection fall within the scope of paragraph 2. Doing so would eviscerate that paragraph's plain language. The Court finds that Pamela Conforti's use of Michael Conforti as a "sounding board" with respect to the selection of a facility for Phoenix Investment to lease before she decided to form Phoenix Preclinical does not fall within the scope of paragraph 2.

NAMSA also asserted that Michael Conforti's use as a "sounding board" falls within the scope of paragraph 3 of the agreed-upon waiver. (Dkt. 202 at 16:17-18.) Paragraph 3 is a waiver as to "[a]ny spousal communications regarding the alleged taking of NAMSA's proprietary information or trade secrets, or the alleged exchange of that proprietary information or trade secrets between Ms. Conforti and Dr. Conforti." However, NAMSA at times described the discussions at issue regarding Phoenix Investments' selection of a building as relating to "allegations about violations of noncompetes"—not the taking or exchange of trade secrets or proprietary information.

(*Id.* at 13:17-24.)  Noncompete agreements were not within the scope of paragraph 3.[7] And NAMSA has not articulated how communications around Phoenix Investment's purchase of a building with the possibility of leasing it (even to a NAMSA competitor) implicates communications around the taking or exchange of NAMSA's proprietary information or trade secrets.  The Court denies the Motion insofar as it seeks relief with respect to the Confortis' discussions about Phoenix Investments' selection of a facility to purchase.

The second issue raised with respect to Pamela Conforti's deposition is counsel's assertions of privilege over exhibits PC10 and PC11.  (Dkt. 128 at 10-12; *see also* Dkt. 202 at 29:24-30:25.)  During Pamela Conforti's deposition, NAMSA attempted to introduce exhibits PC10 and PC11, which were email communications between the Confortis using their NAMSA email addresses.  (Dkt. 133 at 69:6-71:20, 73:23-76:6.) Defendants' counsel objected and instructed Pamela Conforti not to answer questions about these exhibits based on the marital communications privilege.  (*Id.*)  Counsel later objected to the use of PC10 and PC11 during Michael Conforti's deposition.  (Dkt. 133-1 at 47:15-48:17.)  However, Defendants later withdrew their privilege assertions over those specific exhibits and agreed to produce them.  (Dkt. 202 at 29:24-30:19.)  During

---

[7]      The Court does not understand NAMSA to have argued that violations of the noncompete clauses were included in paragraph 3.  In any event, given NAMSA's arguments that the claims for misappropriation of proprietary information and trade secrets relate to federal law (Dkt. 202 at 42:21-25), and while the "noncompete obligations" are based on contracts and state law (*id.* at 19:12-14; *see also* Dkt. 97 ¶ 91 (identifying confidentiality agreements as containing non-competition language)), the Court declines to import allegations relating to violation of noncompete clauses into paragraph 3.

the hearing, NAMSA stated that the relief it seeks is "to be able to use them without restriction in a further deposition." (*Id.* at 30:20-25.)

It appears NAMSA seeks relief to which Defendants had already agreed, as Defendants stated in their brief:

> To the extent NAMSA needs to further depose Ms. Conforti regarding the NAMSA emails between Ms. Conforti and Dr. Conforti that Ms. Conforti and Phoenix Preclinical agreed to produce, Ms. Conforti has already indicated a willingness [sic] reopening the deposition on the specific documents at issue, subject to the remaining time limitations expressed a willingness to consider an alternate route, such as a declaration in lieu of testimony, making court intervention unripe and unnecessary.

(Dkt. 188 at 27 (citing Dkt. 190-1).)  Dr. Conforti's counsel also agreed to reopening his deposition.  (Dkt. 190-1 at 3.)

Defendants made this offer of reopening the Confortis' depositions on April 22, 2024.  (Dkt. 190-1 at 3.)  Given that Defendants offered to reopen the Confortis' depositions on April 22, 2024, and NAMSA had not taken Defendants up on that offer as of the May 9, 2024 hearing on this Motion, it does not appear that NAMSA needs to reopen depositions for purposes of their Amended Motion for Preliminary Injunction. Consequently, to the extent any relief is required, NAMSA may use PC10 and PC11 at future depositions in this case, subject to any restrictions imposed by the Protective Order, but the Court will not order reopening of Pamela Conforti's or Michael Conforti's deposition solely for purposes of examining them regarding PC10 and PC11.  The Motion is denied as moot insofar as NAMSA seeks to be able to use PC10 and PC11 at depositions and denied to the extent NAMSA seeks reopening of the Confortis' expedited discovery depositions.

21

### 2.      Michael Conforti's Deposition and Exhibits

The Court turns to Michael Conforti's deposition.  NAMSA argues that inconsistencies in Michael Conforti's testimony and objections made to certain exhibits during his deposition require a finding of waiver.  (Dkt. 128 at 9-10.)  The Court first addresses the alleged inconsistent testimony.  NAMSA's counsel clarified at the hearing what testimony NAMSA believes gives rise to the waiver:

> So according to his testimony under cross-examination, [Michael Conforti] had communications about Phoenix Preclinical Laboratories with his wife in these variety of different ways.
>
> But then when we asked him specifically about what we thought was undoubtedly the subject of the waiver, asking him whether he had communicated in a privileged setting about creating the business, Phoenix Preclinical Labs, he was instructed not to answer that question. And that struck us. That's, again, at Lankenau Exhibit 2. It was towards the end of the day. It was at page 198. And the question was designed to focus on the subject matter that we thought was clearly the topic of the waiver, but he was instructed not to answer.

(Dkt. 202 at 21:12-25.)

The Court pointed out to NAMSA's counsel that Michael Conforti had answered the question: "Is it your position that in all of the communications you've had with Ms. Conforti that you have withheld in this action, there are no communications about the funding, founding, creation, organization, or operation of Phoenix?" with "Correct."  (*Id.* at 22:1-8.)  NAMSA acknowledged that fact and responded: "[W]e've been unable to test that without what we think should be the full scope of the waiver and to look at documents that we suspect relate to exactly those facts" and: "[T]he testimony was inconsistent.  On the one hand, he said he had these communications.  Later he denied it.

And then, as you just read into the record, he also said he never had those

communications."  (*Id.* at 22:9-22.)

The Court reproduces the relevant portions of the transcript of Michael Conforti's

deposition below.

Q.  You communicate with your wife, Ms. Conforti, by text from time to time, I imagine?

A.  Yes.

Q.  And you delete her texts as well?

A.  Yes.

Q.  What are the ways in which you communicate with Ms. Conforti, if at all, about Phoenix Preclinical Labs?

MR. MAGARIAN: As long as we're talking about the funding, founding, creation, organization or operation of Phoenix, I don't have an objection.

THE WITNESS: Can you repeat those? Sorry. I know you've repeated them a thousand times, but give them to me again.

MR. MAGARIAN: Sure.

MR. MADEL: Funding, founding, creation, organization and operation. This is our waiver. Is it okay if I show it to him?

MR. GROSS: You can show him. I'm going to ask to see it after you do.

(Crosstalk.)

MR. MAGARIAN: You've had this for --

MR. MADEL: We can make it an exhibit, if you want, too. Can you email it to him so he has a copy of the document?

MR. MAGARIAN: I think I may have an extra hard copy.

THE WITNESS: All through verbal communication.

BY MR. GROSS:

Q. Face to face?

A. Sometimes.

Q. On the phone?

A. Yes.

Q. Never by text?

A. Potentially by text. Is that by not phone?

Q. How about by email?

A. Probably not too often.

Q. But sometimes?

A. Maybe.

MR. MADEL: Just so the record's clear, I handed [Mr. Gross] a copy of the same document that is in front of the witness.

MR. GROSS: Which is, as I understand, the defendants' description of what they're willing to waive with respect to the spousal privilege, right?

MR. MADEL: Correct.

MR. GROSS: Okay. Which is not something with which NAMSA agrees, but I understand your waiver position.

BY MR. GROSS:

Q.  All right. So any other forms in which you communicate with Ms. Conforti about Phoenix Preclinical Labs other than live and in person, face-to-face, on the phone, by text or by email?

A. Correct.

Q. I think you may have misheard my question. Let me ask it again. May I please?

A. Sure.

Q.  Are there any other forms in which you communicate with Ms. Conforti about Phoenix Preclinical Labs other than live in person, face-to-face, by phone or by email?

MR. MAGARIAN: Object as to form of the question and vague.

MR. MADEL: Join.

BY MR. GROSS:

Q.  I didn't mean to leave out texting. You mentioned that, also. Are those all the forms in which you communicate with Ms. Conforti about Preclinical Labs?

MR. MAGARIAN: Same objections.

THE WITNESS: Seemingly, yes.

(Dkt. 133-1 at 138:6-141:6.)

Then, at the end of deposition, Michael Conforti's attorney elicited the following

testimony:

BY MR. MADEL:

Q.  With that, Dr. Conforti, you were asked some questions by counsel about methods of communications with your wife. Do you recall that?

A.  Yes.

Q.  And I think that there might have been two ships passing in the night with respect to those questions, so I'm just going to ask you two open-ended questions here. Okay? Number one, what methods of communication have you generally used to communicate with your wife?

A.  Verbal, phone, which includes text, and email.

Q.  What methods of communication did you use to communicate with your wife regarding the funding, founding, creation, organization and operation of Phoenix?

MR. GROSS: Objection. Compound. Object to the extent I need to note NAMSA's disagreement with the --

MR. MADEL: I will withdraw the question. If you're going to object on the basis of it being compound, then I'll break it on up. I was just trying to respect you trying to get to the airport.

BY MR. MADEL:

Q.  So let me break it up. What methods of communication did you use to communicate with your wife regarding the funding of Phoenix?

A.  None.

Q.  What methods of communication did you use to communicate with your wife regarding the founding of Phoenix?

A.  None.

Q.  What methods of communication did you use to communicate with your wife regarding the creation of Phoenix?

A.  None.

Q.  What methods of communication did you use to communicate with your wife regarding the organization of Phoenix?

A.  None.

Q.  What methods of communication did you use to communicate with your wife regarding the operation of Phoenix?

A.  None.

(*Id.* at 195:20-197:15.)

This testimony elicited re-examination by NAMSA's counsel, as set forth below.

Q.  Dr. Conforti, is it your testimony today that you have never once ever communicated with Ms. Conforti about funding her business, Phoenix Preclinical Labs?

A.  Correct.

Q.  In any form?

A.  In any form.

Q.  And the two of you have also never communicated about her founding that business?

A.  Correct.

Q.  And you have never communicated, even in a privileged setting, about creating the business?[8]

MR. MAGARIAN: Hold on a sec. Now you're expressly asking him to disclose privilege.

MR. GROSS: I want to know if he's withholding information on these topics, that's all.

MR. MAGARIAN: You're instructed not to answer to the extent that counsel's now asking you to specifically disclose privileged communications.

MR. MADEL: Agreed.

BY MR. GROSS:

Q.  Dr. Conforti, your testimony today is that you have never once ever communicated about the organization of Phoenix Preclinical Labs with your wife?

A.  Correct.

Q.  And your testimony is that you have never once communicated about the operation of Phoenix Preclinical Labs with your wife?

A.  Correct.

Q.  You have withheld communications as privileged, invoking the spousal privilege in discovery in this action, right?

---

8       NAMSA suggests this instruction not to answer should result in waiver (Dkt. 128 at 9), but its argument is unclear.  In any event, the Court would not find waiver because the Court cannot discern from this question if NAMSA was asking if the Confortis had communicated in an attorney-client privileged setting about creating the business, in a marital privilege setting, or some other privileged setting.  If NAMSA believed this question fell within the scope of the Waiver Agreement, it had the opportunity to explain why during the deposition—or in connection with this Motion.

A.  Say that again.

Q.  You have withheld communications with Ms. Conforti because you've invoked your spousal privilege in this action, right?

MR. MAGARIAN: Objection. Form.

MR. MADEL: Same.

THE WITNESS: Correct.

BY MR. GROSS:

Q.  And you're aware that Ms. Conforti has also withheld communications with you, invoking the spousal privilege in this action?

MR. MADEL: Objection. Form.

MR. MAGARIAN: Objection. Form.

THE WITNESS: Correct.

BY MR. GROSS:

Q.  Let's see if your counsel will allow a yes-or-no answer to this question. Is it your position that in all of the communications with Ms. Conforti that you have withheld in this action, there are no communications about the funding, founding, creation, organization or operation of Phoenix?

MR. MADEL: Hold on one second. Hold on.

MR. MAGARIAN: Only because the – I find the question confusing, but you're just basically asking him in what – what's been withheld, is he withholding anything that falls within our waiver.

MR. GROSS: I don't think that's the way I asked it.

MR. MAGARIAN: Huh?

MR. GROSS: I don't think that's the way I asked it.

MR. MAGARIAN: Well, I – I'm trying to understand what you're asking. So is what you're asking, we've got our waiver of those -- those – where's the -- I had it in front of me -- thank you.

MR. GROSS: It's actually not related to the waiver, it's related to what you haven't waived. It's related to what's withheld.

MR. MAGARIAN: Right. But our waiver is any spousal communications regarding the funding, founding, creation, organization, operation of Phoenix. Anything that fits within those, we have produced. And so is your question did we not produce something that fits within one of these waiver exceptions?

MR. GROSS: That wasn't the question. I don't --

MR. MAGARIAN: Then I don't understand the question.

MR. GROSS: I don't have my realtime. Maybe we'll have it read back, please. The question before the colloquy among counsel.

(The question was read.)

MR. MADEL: I hear that to be exactly what [Mr. Magarian] just asked.

MR. MAGARIAN: And you just told me it wasn't, so that's why I'm confused.

MR. GROSS: I wasn't interested in rephrasing it. I'd like an answer to that question so I wanted it read back.

MR. MAGARIAN: Okay. But -- understand. Where – I'm saying the question's vague. I'm trying to make sure we understand the question before he gives an answer since we're dealing with an issue of privilege. And if my understanding is correct -- and I'm happy to have you ask the question the way you've asked it but with the understanding that my interpretation is correct.

MR. GROSS: Yeah, I think we're on the same page.

MR. MAGARIAN: Okay.

THE WITNESS: You guys are going to have to get me on the same page as you because I'm thoroughly confused by the whole privilege matter to begin with.

MR. MADEL: Do you need the question read back again?

THE WITNESS: Yes, probably a couple times.

MR. MAGARIAN: And then maybe with -- and with my understanding of the question read back as well.

MR. GROSS: No. You and I can discuss the question, but I get to ask them of the witness. So he gets to hear the question again. You can make your objection. If there's an instruction, you'll make it. I was happy to discuss with you how you're interpreting it, and I think we're on the same page. But the pending question is the pending question, and you have the opportunity to make your objection and any instructions you think you need to make.

MR. MAGARIAN: Well, then I want my objection read back after the -- with my understanding after the question's read back. This is an issue of privilege. I'm not --

MR. GROSS: I understand.

MR. MAGARIAN: Okay. Which is not just, you know, a question about a tattoo. So I get -- I need to make sure that the privilege is respected. I understand why you don't want it to be, but I need to make sure that the privilege is respected, and so that means that the witness needs to make sure he fully understands the question. And if we're on the same page, I don't know what the big deal is.

MR. GROSS: There's a pending question.

THE WITNESS: Somebody's going to have to read it back to me.

MR. GROSS: Would you please read the question before the lawyer colloquy again.

(The question was read.)

MR. MAGARIAN: And if you could read my objection and my understanding of that question.

MR. MADEL: Do you understand the question?

THE WITNESS: Can I get the question back again?

(Crosstalk.)

(The question was read.)

THE WITNESS: Can you read it again? Same break.

(The question was read.)

THE WITNESS: Correct.

(*Id.* at 197:23-204-2.)

The Court includes these lengthy excerpts in this Order because they provide context for the "inconsistency" identified by NAMSA at the hearing, that is that Michael Conforti gave inconsistent testimony between pages 140-141 and 198-199 of the transcript about whether he had communications with Pamela Conforti about the funding, founding, creation, organization, or operation of Phoenix Preclinical. (*See* Dkt. 202 at 21:3-7, 21:16-25, 22:18-22.) The Court disagrees. The question first asked by NAMSA was: "What are the ways in which you communicate with Ms. Conforti, if at all, about Phoenix Preclinical Labs?" (Dkt. 133-1 at 138:11-13.) This prompted a statement by Pamela Conforti's counsel that he had no objection "as long as we're talking about the funding, founding, creation, organization or operation of Phoenix," crosstalk related to his statement, and counsel's provision of the waiver scope to Michael Conforti. (*Id.* at 138:14-139:9.) Then Michael Conforti responded "[a]ll through verbal communication" and identified face-to-face, phone, texting, and email as those means. (*Id.* at 139:10-23.) NAMSA's counsel then asked: "Are there any other forms in which you communicate with Ms. Conforti about Phoenix Preclinical Labs other than live in person, face-to-face, by phone or by email?" and clarified: "I didn't mean to leave out texting. You mentioned that, also. Are those all the forms in which you communicate with Ms. Conforti about Preclinical Labs?" (*Id.* at 140:18-141:4.) Michael Conforti responded: "Seemingly, yes." (*Id.* at 141:6.)

31

The problem with NAMSA's reliance on this testimony is that NAMSA's counsel's questions at pages 140 and 141 (and page 138) were not limited to questions falling within the scope of the Waiver Agreement, that is, the funding, founding, creation, organization or operation of Phoenix Preclinical.  It appears that NAMSA thinks that counsel's statement that "[a]s long as we're talking about the funding, founding, creation, organization and operation of Phoenix [Preclinical], I don't have an objection" beginning on page 138 somehow limited the scope of NAMSA's preceding question as well as those on pages 140 and 141.  But it is not at all clear that Michael Conforti interpreted any of those questions as so limited, particularly given that NAMSA's counsel then asked (twice) about his communications with Pamela Conforti without any limitation as to their subject matter on pages 140 and 141 of the transcript.  In fact, Michael Conforti seemed confused about the scope of the waiver and what was being asked.  (*See, e.g.*, *id.* at 138:14-18 (asking for waiver scope "again" even though he had heard the categories "a thousand times"); *id.* at 140:10-17 (mishearing question).)

Michael Conforti's lawyer referenced this apparent confusion when initiating his "two ships" questioning, at which time Michael Conforti testified that he used "verbal, phone, which includes text, and email" to communicate with Pamela Conforti "generally" but had no communications with her regarding the funding, founding, creation, organization or operation of Phoenix Preclinical.  (*Id.* at 195:21-197:15.)  On re-examination by NAMSA's counsel, Michael Conforti answered "Correct" when asked: "Is it your position that in all of the communications with Ms. Conforti that you have

withheld in this action, there are no communications about the funding, founding, creation, organization or operation of Phoenix?" (*Id.* at 199:22-204:4.)

The bottom line is that the Court is not persuaded there is any inconsistency in Michael Conforti's testimony on pages 140-141 and pages 199-200. To the extent there could be any inconsistency, it is the type that may occur during a deposition and which follow-up questioning could have clarified (or sharpened to better present the issue to the Court). The Court declines to find a waiver based on Michael Conforti's testimony about his communications with Pamela Conforti about Phoenix Preclinical and denies the Motion insofar as it is based on this testimony.

The Court turns to NAMSA's challenge based on Defendants' assertion of privilege as to Exhibits MC12 and MC13 from Dr. Conforti's deposition, which counsel described as NAMSA and APS emails. (Dkt. 202 at 31:10-24.) During Dr. Conforti's deposition, counsel asserted privilege over MC12 and MC13. (Dkt. 133-1 at 128:1-130:10.) MC12 is an email chain between the Confortis beginning January 13, 2021 and ending January 19, 2021 that are "APS emails, not NAMSA." (Dkt. 133-2 at 129:3-18.) MC13 is an email sent to Dr. Conforti at namsa.com dated May 13, 2022. (*Id.* at 129:12-20.) NAMSA stated at the hearing that there was still a dispute as to MC12 and MC13. (Dkt. 202 at 31:10-24.) But it appears that the MC13 may fall within the scope of Defendants' agreed-upon production, as it is a communication that occurred on NAMSA's server on or after February 26, 2021. (*See* Dkt. 188 at 22.)

At this point, the Court is unable to ascertain from the record whether a dispute remains regarding MC12 and MC13, and counsel barely addressed these exhibits at the

hearing.  (*See* Dkt. 202 at 31:10-20.)  Because the parties have not made clear whether there is still a dispute, the Court denies without prejudice the Motion as to MC12 and MC13.  To the extent NAMSA still seeks production of MC12 and MC13 and Defendants maintain their assertion of privilege, NAMSA may file a letter brief of no more than 3 pages submitting the exhibits for in camera review within 7 days after the date of this Order, and Defendants may file a letter brief of no more than 3 pages in response within 7 days after the date of NAMSA's filing.  The parties may not raise any new issues in those letter briefs.

**C.     FlexSchema, Phoenix Preclinical, and APS Emails**

NAMSA argues that Defendants waived any potentially applicable marital communications privilege over communications made through their business email accounts, specifically their FlexSchema, Phoenix Preclinical, and APS emails.  (Dkt. 128 at 4-5, 19-22.)  NAMSA argues that the Confortis had no reasonable expectation of privacy in those emails, because the FlexSchema and Phoenix Preclinical were "employer-monitored systems," and because APS had a policy that "management" had the right to monitor all email.  (*Id.* at 20-21.)  NAMSA further argues that communicating in the presence of a third-party employer waives the privilege.  (*Id.* at 20.)

Defendants responded that courts have declined to find a waiver where the persons at issue were owners or "the management" of the company, as the Confortis were with respect to APS and are with respect to FlexSchema, and as Pamela Conforti is with respect to Phoenix Preclinical.  (Dkt. 188 at 24-26.)  Defendants also argue that emails sent on the APS server before February 26, 2021 (when NAMSA purchased APS) are not

relevant to any claim or defense in this matter, nor are emails sent on the FlexSchema

server, as FlexSchema is not a competitor to NAMSA and in fact was one of NAMSA's

vendors.  (*Id.* at 21-24.)

### 1.    FlexSchema and Phoenix Preclinical Emails

The Court first addresses the FlexSchema and Phoenix Preclinical emails.

Counsel for Pamela Conforti and Phoenix Preclinical represented to the Court that no

responsive documents are being withheld from Phoenix Preclinical email accounts on the

basis of marital privilege.  (Dkt. 202 at 66:13-22.)  Counsel also represented that no

responsive documents were withheld from the FlexSchema email accounts on the basis of

marital privilege.  (*Id.* at 62:12-63:20.)  Based on these representations, the Court denies

the Motion as moot as to Phoenix Preclinical and FlexSchema emails because, based on

the representations of counsel, there are no documents for Defendants to produce.  *See*

*Century Industries Co. v. Rosemount Inc.*, No. Civ. 01-103 (DWF/AJB), 2002 WL

1035455 at *2 (D. Minn. May 21, 2002) (affirming denial of motion to compel where:

"Defendant's counsel, as officers of the court, have represented to the Court that the full

documents have been produced.  Plaintiffs have offered no concrete basis to believe that

Defendant's counsel have misrepresented themselves to the Court; rather Plaintiffs would

have the Court disregard the attorneys' representations to the Court solely on the basis of

rank speculation."); *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 637 (D. Minn.

2000) ("As a matter of practical reality, the Court must accept, at face value, a party's

representation that it has fully produced all materials that are discoverable. . . .  Here, we

must accept [Defendant's] representation, that it is currently unable to respond to the

Plaintiffs' discovery requests because it has no such documents.  If, upon further inquiry, [Defendant's] representation is untrue, and unjustified, then the full panoply of sanctions, under Rule 37, are available to us in rectifying such egregious misconduct.") (cleaned up).

### 2.    APS Emails

The Court turns to NAMSA's request that the Court order Defendants to produce emails sent on APS servers before NAMSA acquired APS in February 2021.  (*See* Dkt. 128 at 19.)  The Court learned at the May 9, 2024 hearing that NAMSA already has those emails, because NAMSA owns and possesses the APS email server or servers, and also learned that NAMSA has already searched that server or servers for documents, including emails dating before NAMSA's acquisition of APS.  (*Id.* at 94:15-96:18.)  It appears that NAMSA is asking the Court to order Defendants to produce emails that NAMSA already has.  When the Court raised this point at the hearing, NAMSA stated that it was concerned that Defendants may have APS emails that NAMSA does not have, and that Defendants should have produced the APS emails they do have.  (*Id.* at 89:1-9.)  The Court then confirmed that NAMSA was asking for an order that "to the extent that the Confortis have APS emails from before February 26th, 2021 that are responsive to discovery in this case, that the Court determine that those emails which you [(NAMSA)] don't have are not protected by the marital privilege." (*Id.* at 89:10-15.)  NAMSA confirmed that was its request.  (*Id.* at 89:16-17.)  The Court declines to make this determination for several reasons.  First, NAMSA appears to be asking for a finding of no privilege in a vacuum, as NAMSA's speculation that the Confortis may have pre-

February 26, 2021 APS emails that are not on the APS servers lacks any support in the record. In other words, there do not appear to be any emails at issue. Second, NAMSA has access to the pre-February 26, 2021 APS email servers, but has not made a showing that emails between the Confortis before that date contain information relevant to a claim or defense in this action, much less any showing that requiring Defendants to search their APS emails (if they have any in their possession, custody, or control) and produce responsive documents is proportionate to the needs of the case. Notably, NAMSA's February 26, 2021 purchase of APS occurred over a year before the May 2022 alleged misappropriation. (*See* Dkt. 97 ¶ 165.)

As the party seeking discovery, the burden is on NAMSA to show relevance and proportionality. *See In re: EpiPen Direct Purchaser Litig.*, No. 20-CV-827 (ECT/JFD), 2023 WL 2675134, at *3 (D. Minn. Mar. 29, 2023) ("If the moving party meets its initial burden of showing that the requested discovery is relevant and proportional, then the burden shifts to the party resisting discovery to show that it is not relevant or is unduly burdensome."); *Sadare v. Bosch Automotive Service Solutions Inc.*, No. 19-CV-3083 (NEB/ECW), 2021 WL 4317432, at *3 (D. Minn. Sept. 23, 2021) ("The Eight[h] Circuit has held that the party seeking discovery has the burden of showing relevance before the requested information is produced.") (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)). The Court denies this Motion insofar as NAMSA seeks an order finding the marital privilege does not apply to pre-February 26, 2021 emails sent on the APS servers and requiring Defendants to produce such emails because NAMSA has not met its threshold burden of showing this discovery is relevant or proportionate to the

needs of the case (particularly given that NAMSA has access to and has searched the APS email servers and could have relied on pre-February 26, 2021 emails on those servers to make this showing). Because the Court denies the Motion on this ground, the Court need not and will not rule at this time on the question of whether the Confortis had a reasonable expectation of privacy in their pre-February 26, 2021 emails sent on APS servers.

However, as recognized above, it appears that there may still be a dispute over MC12, which is an email chain between the Confortis beginning January 13, 2021 and ending January 19, 2021 that are "APS emails, not NAMSA." (Dkt. 133-2 at 139:3-18; *see* Dkt. 133-1 at 129:1-130:10.) If there is still a dispute over MC12, NAMSA and Defendants must use the 3-page letter brief procedure described above if NAMSA still seeks production of that document and Defendants oppose its production. The parties may renew their reasonable expectation of privacy arguments in those letter briefs.

### 3.     "Business Affairs" Exception

The Court turns to the parties' dispute over the "business communications" or "business affairs" exception to the marital communications privilege, as NAMSA argues that exception is a basis for ordering production of emails sent over FlexSchema, Phoenix Preclinical, and APS systems. (Dkt. 128 at 22-24.) The exception applies when the communications "[are] not intended [to be] confidential," otherwise lack "some other indication of confidentiality," or would likely "have been shared with other persons." *Veracities PBS v. Strand*, 602 F. Supp. 3d 1354, 1359 (D. Or. 2022). NAMSA argues that "[a]lthough the Eighth Circuit has not yet had the opportunity to expressly consider

the 'business affairs' exception to the marital communications privilege," according to NAMSA, "the Eighth Circuit has recognized, 'the fact that the communication relates to business transactions tends to show that it was not intended as confidential.'" (Dkt. 128 at 22-23 (citing *Fowler v. United States*, 352 F.2d 100, 113 (8th Cir. 1965)) (cleaned up).) NAMSA urges the Court to adopt the exception and order the "production of all improperly withheld documents and communications relating to the Confortis' business." (*Id.* at 24.) Defendants oppose the application of the exception, noting that it has not been recognized by the Eighth Circuit or the District of Minnesota and asserting that NAMSA has not met its burden of establishing that specific withheld communications are subject to the exception. (Dkt. 188 at 27-31.)

Given the Court's denial of the Motion on other grounds, the Court need not decide in this Order whether to adopt the business affairs exception to the marital communications privilege. However, if the parties have not resolved their disputes over MC12 and MC13, the parties may make arguments relating to this exception in their 3-page letter briefs.

## D.   NAMSA's Appendix A

Part of the relief sought by NAMSA is an order requiring Defendants to produce all withheld documents and communications that hit on the search terms attached to NAMSA's brief as Appendix A. (Dkt. 128 at 18-19, 24; *see id.* at 27-28 (Appendix A).) Given the Court's denial of the Motion, the Court denies this request for relief as moot. In any event, the Court would not be inclined to order Defendants to run NAMSA's proposed search terms in Appendix A. Although Defendants shared some of their search

terms with NAMSA, the parties did not meet and confer regarding search terms during expedited discovery.  (Dkt. 202 at 49:14-25.)  Expedited discovery closed without Defendants raising any concerns about search terms, and NAMSA has not met and conferred with Defendants regarding any deficiencies in Defendants' searching.  (*See id.* at 56:10-25.)  If NAMSA wishes to meet and confer with Defendants regarding search terms during the regular discovery period, it can and should do so, and if the parties cannot reach agreement, NAMSA may bring any disputes to the Court by a motion or through IDR.

**E.    Defendants' Amended Privilege Logs**

NAMSA raised three specific issues relating to PRIV007356, PHOENIX_00110619, and PRIV007136 in its notice relating to Defendants' amended privilege logs (Dkts. 213, 214), to which Defendants responded (Dkt. 278).  The Court addresses those issues below.

*PRIV007356.*  The description for this entry with a document date of March 21, 2023 has been amended to read: "Spousal communication exclusively between P Conforti and M Conforti regarding P Conforti conversation with third party about potential Phoenix Investment acquisition."  (Dkt. 214-1 at 22.)  NAMSA argues this document falls within paragraph 2 of the waiver (relating to the funding, founding, creation, organization, and operation of Phoenix Preclinical) because, according to NAMSA, that category "includes acquiring facilities to support the creation, organization, or operation of Defendant Phoenix Preclinical Labs."  (Dkt. 213 at 1-2.) For the same reasons stated in Section III.B.1, *supra*, relating to Pamela Conforti's

testimony about her conversations with Michael Conforti relating to her search for and selection of a facility to purchase for Phoenix Investments, the Court rejects this argument.

***PHOENIX_00110619 and PRIV0716.***  The amended subject line for PHOENIX_00110619 reads "Redacted email with attachments from M. Conforti to P. Conforti regarding PPP loan forgiveness amount appeal."  (Dkt. 214-1 at 24.)  NAMSA asserts that the PPP "loan-related" materials are proprietary and trade secret and fall within paragraph 3 of the Waiver Agreement.  (Dkt. 213 at 2.)  Defendants assert that the document does not relate to the exchange of proprietary information or trade secrets between the Confortis or any documents or information that they allegedly took from NAMSA.  (Dkt. 278 at 2.)

As for PRIV07136, the amended subject line reads "Spousal communication exclusively between P. Conforti and M. Conforti regarding E. Drake email regarding NAMSA's compliance with drug regulations and matters unrelated to the litigation." (Dkt. 214-1 at 22.)  NAMSA claims this relates to business affairs, "specifically NAMSA's compliance with drug regulations and its employee Dr. Drake, and to NAMSA's claim that Dr. Conforti made defamatory statements on such topics."  (Dkt. 213 at 2.)  Defendants assert that it "relates in no way to the business affairs of Ms. Conforti and Dr. Conforti."  (Dkt. 278 at 2.)

The parties' competing characterizations of PHOENIX_00110619 and PRIV0716 underscore the fact-specific nature of privilege disputes and the difficulty of resolving them on a global basis or in the abstract.  The Court declines to find a waiver based on

competing descriptions of documents when the documents are not before the Court. Should NAMSA wish to compel production of these documents, it must meet and confer with Defendants and file a properly supported motion if it still seeks relief after doing so. The parties are advised that the Court will entertain a request for sanctions in the form of reasonable expenses under Rule 37(a)(5)(A), (B), or (C) if the motion is granted, denied, or granted in part and denied in part, respectively.

Finally, NAMSA takes issue with Michael Conforti's removal of "non-responsive" documents from his prior log and the sufficiency of his descriptions in the amended log. (Dkt. 213 at 3.) If NAMSA seeks relief as to the amended privilege log, it must meet and confer with Defendants and file a properly supported motion—with the same caution to the parties as to reasonable expenses under Rule 37(a)(5)(A), (B), or (C) as stated with respect to PHOENIX_00110619 and PRIV0716. However, NAMSA's non-specific arguments as to Michael Conforti's amended privilege log do not change the Court's analysis as to this Motion.

## IV.   ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Plaintiffs North American Science Associates, LLC and NAMSA Holdco, LLC's "Motion to Compel Discovery and Preclude Defendants from Asserting the Marital Communications Privilege as a Sword and a Sheild [sic]" (Dkt. 126) is **DENIED**.

2.     To the extent Plaintiffs North American Science Associates, LLC and NAMSA Holdco, LLC still seek production of MC12 and MC13 and Defendants

maintain their assertion of privilege over those documents, Plaintiffs may file a letter

brief of no more than 3 pages submitting the exhibits for in camera review within 7 days

after the date of this Order, and Defendants may file a letter brief of no more than 3 pages

in response within 7 days after the date of that filing.  The parties may not raise any new

issues in those letter briefs.


DATED: June 25, 2024                           *s/Elizabeth Cowan Wright*
                                               ELIZABETH COWAN WRIGHT
                                               United States Magistrate Judge