## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

North American Science Associates, LLC,      Case No. 24-cv-287 (JWB/ECW)
*an Ohio limited liability company also
known as NAMSA*, and NAMSA Holdco,
LLC, *a Delaware limited liability company*,

       Plaintiffs,

v.                               **ORDER**

Michael Conforti, Pamela Conforti, and
Phoenix Preclinical Labs, LLC, *a Minnesota
limited liability company*,

       Defendants.

---

This case is before the Court on Plaintiffs North American Science Associates,

LLC and NAMSA Holdco, LLC's (collectively, "NAMSA entities") Motion for

Sanctions Against Defendants Michael Conforti and Pamela Conforti for Evidence

Spoliation (Dkt. 151). The Court heard oral argument on the Motion on June 28, 2024

(Dkt. 319), and the matter is now ready for decision.[1]

---

[1]      The NAMSA entities have filed several motions since filing the instant Motion, including a Motion for Leave to File a Second Amended Complaint. (Dkts. 160, 279, 340, 355.) They have not sought to expand the record as to the instant Motion, so the Court makes its decision based on the record that existed as of the conclusion of the June 28, 2024 hearing.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Michael and Pamela Conforti and American Preclinical Services

Defendants Michael Conforti ("Michael") and Pamela Conforti ("Pamela")[2] married in 1993.  (Dkt. 242 ¶ 2.)  Michael earned his Bachelor's and Master's degrees in Biology from the University of Illinois Urbana-Champaign in 1991 and 1993, respectively; his Doctorate in Veterinary Medicine from the University of Wisconsin-Madison in 1997; and his Master's in Business Administration in 2003.  (Dkt. 242 ¶ 2.)  Pamela earned a Bachelor of Science in Accounting from the University of Illinois Urbana-Champaign and a Master of Science in Business Education from the University of Wisconsin-Whitewater.  (Dkt. 250 ¶ 2.)  She earned her CPA license from the State of Wisconsin.  (Dkt. 250 ¶ 2.)  Pamela worked for over 12 years, beginning while earning her Master's degree, as a public accountant, financial analyst, and consultant, until she began working at American Preclinical Services ("APS") in August 2005.  (Dkt. 250 ¶¶ 3, 8.)

Michael started APS in 2005.  (Dkt. 242 ¶ 3.)  APS was a preclinical medical technology contract research organization ("CRO") that performed testing of medical devices, pharmaceuticals, and other various biotechnology using animal and cell-based models.  (Dkt. 242 ¶ 4.)  Michael was the sole owner of APS and served as its President from 2005 to 2021, when North American Science Associates, LLC ("NAMSA") acquired APS.  (Dkt. 242 ¶¶ 3, 7.)  Pamela served as APS's Chief Financial Officer and

---

[2]     For readability, the Court refers to Defendant Michael Conforti as "Michael" and Defendant Pamela Conforti as "Pamela" in this Order.

Chief Information Officer from 2005 to 2021, and as its Human Resources from 2005 to 2011. (Dkt. 250 ¶ 8.) Michael and Pamela operated APS together, having started the business "from scratch," and grew the business to over 300 employees. (Dkt. 242 ¶¶ 3, 5, 6.)

## B.    NAMSA's Acquisition of APS

In February 2021, NAMSA purchased APS for approximately $44 million. (Dkt. 242 ¶ 7; Dkt. 245 at 17:18-19.)[3] Michael and Pamela signed Employment Agreements, on or about February 15, 2021, with their employment conditioned on their execution of Confidentiality Agreements with respect to "confidential and proprietary" information belonging to NAMSA, where their confidentiality obligations continued after their employment ended. (Dkt. 180 ¶ 7; Dkt. 180-5 at 3-4; Dkt. 180-6 at 3-4.)[4] Michael and Pamela also agreed not to compete with NAMSA for certain periods of time. (Dkt. 180 ¶¶ 7-8; Dkt. 180-5 at 8; Dkt. 180-6 at 8; Dkt. 181-3; Dkt. 217 ¶ 2.) Michael also signed a Restricted Covenant Agreement ("RCA") in connection with NAMSA's purchase of APS. (Dkt. 180 ¶ 8.) Michael stayed on after the sale as the Vice President of ISR Laboratory Operations. (Dkt. 242 ¶ 8.) However, NAMSA removed him from executive leadership within three months after the purchase and, within the first eight months after the sale, Michael became an "individual contributor" without any managerial

---

[3]    Pin citations to transcripts are in the page:line format.

[4]    Unless otherwise noted, page citations to materials filed on the docket are to the CM/ECF pagination.

responsibilities.  (Dkt. 242 ¶ 8.)  Pamela stayed on as the Director of Finance after the purchase.  (Dkt. 97 ¶ 26; *see* Dkt. 180-4 at 2.)

## C.   NAMSA Terminates Pamela's Employment and Pamela Copies Certain NAMSA Files

On May 18, 2022, NAMSA told Pamela that it was terminating her employment, where her last day of employment would be May 31, 2022.  (Dkt. 39 ¶ 5; Dkt. 242 ¶ 9.) Pamela planned to use her paid time off until May 31, 2022, and consequently NAMSA and Pamela agreed that her termination would be effective as of June 3, 2022.  (Dkt. 39 ¶ 5.)

On June 1, 2022, Pamela used a 5-terabyte ("TB") Seagate Portable Drive ("the Pamela Seagate Drive") to access NAMSA's "Q:\APSNetwork."  (Dkt. 28 ¶¶ 14-19; Dkt. 185-3 ¶¶ 9, 62-63, 67.)  This folder contained NAMSA's Minnesota facility's QuickBooks accounting records, including what NAMSA describes as its financial and accounting database, comprising detailed customer and vendor financial records and contacts, financial analytics regarding profitability, and the general ledger.  (Dkt. 28 ¶ 19; Dkt. 185-3 ¶¶ 9, 62-63, 67; Dkt. 186 ¶ 16.)  She copied files from this location to the Pamela Seagate Drive, creating corresponding folders on the Pamela Seagate Drive. (Dkt. 185-3 ¶¶ 9, 62-63, 67.)

The NAMSA entities state that NAMSA used the QuickBooks accounting software until November 1, 2023.  (Dkt. 186 ¶ 16.)  They further state that "[b]ecause these QuickBooks records contain highly sensitive financial information that could erode NAMSA's competitive advantage if disclosed to a competitor, NAMSA keeps them

confidential and takes measures to protect them." (Dkt. 186 ¶ 20.) The NAMSA entities

explained that NAMSA "preserves its historic QuickBooks accounting records, including

backup copies for several years" because "they are still relevant and sometimes needed

for ongoing business and client relationships." (Dkt. 186 ¶ 21.) NAMSA states that

these records "would still be enormously valuable for a startup CRO hoping to compete

with NAMSA for talent and clients." (Dkt. 186 ¶ 23.)

Pamela testified during her April 11, 2024 deposition that she downloaded

NAMSA's QuickBooks file to the Pamela Seagate Drive and took it with her when she

left NAMSA. (Dkt. 185 at 92:18-22, 94:4-10.) She further testified that she did so in

case NAMSA lost access to QuickBooks after it transitioned to the new accounting

software, but no one instructed her to do so and she did not tell anybody that she was

doing so. (Dkt. 185 at 93:17-94:3.) In a declaration signed on May 24, 2024, Pamela

stated under penalty of perjury that:

> I downloaded a QuickBooks file prior to my departure, but it had nothing to
> do with any competitive activity. Around the time of my departure from
> NAMSA, I understood that NAMSA was transitioning their accounting
> software away from QuickBooks to a different system and would no longer
> have access to QuickBooks files. Given this, it was necessary to preserve the
> QuickBooks file to provide support for my personal tax returns and also the
> tax returns for APS, if Mike or I were to be audited. I did not download or
> preserve the QuickBooks file for any competitive purpose, and in fact have
> not accessed this file since I downloaded it while still employed at NAMSA
> in early June 2022.

(Dkt. 250 ¶ 19.)

NAMSA's forensic expert Kevin Faulkner stated in a declaration signed on

February 2, 2024 that on June 2, 2022, the files and folders containing this accounting

information on the Pamela Seagate Drive were accessed and interacted with.  (Dkt. 28 ¶ 23.)  Pamela and Michael's forensic expert Mark Lanterman stated in a declaration filed on May 24, 2024 that the June 2, 2022 access occurred from Pamela's NAMSA laptop. (Dkt. 230 ¶ 34.)  Lanterman further stated that there is no evidence that these files were accessed after June 2, 2022, accessed from Pamela's personal laptop, or copied to any other source or computer.  (Dkt. 230 ¶¶ 33-35.)  Although the NAMSA entities describe this copying and access in their brief, they do not appear to argue that these files were accessed after June 2, 2022, nor do they allege Pamela spoliated these files.  (*See* Dkt. 153 at 12-13 (describing copying and access), 24-25 (not identifying QuickBooks files as spoliated evidence).)

According to the February 2, 2024 declaration of NAMSA's expert Faulkner, between June 2 and 10, 2022, Pamela and IT staff at NAMSA exported or attempted to export several PST[5] (Outlook) files to the Pamela Seagate Drive and other external devices.  (Dkt. 28 ¶¶ 24-27.)  Ultimately, on June 10, 2022, a member of NAMSA's IT staff exported email from one folder in Pamela's email mailbox named "Emails/Folders to Export" to a PST file named "exportofemail.pst" ("the PST file") at 5:05 p.m.  (Dkt. 28 ¶ 26.)  On the same day, the PST file was copied to an external USB SanDisk drive having a serial number containing "5045" (the "5045 SanDisk Drive").  (Dkt. 28 ¶ 26.) Then, on June 14, 2022, the PST file was copied to Pamela's personal laptop and opened. (Dkt. 230 ¶¶ 36-37.)  A copy of the PST file continued to reside on Pamela's NAMSA

---

[5]    A PST file is a storage container for email messages, attachments, contacts, and other email mailbox related information.  (Dkt. 28 ¶ 24.)

laptop and was available for Faulkner's examination to determine what email messages and attachments were included.  (Dkt. 28 ¶ 26.)  In total, the export contained 2.68 gigabytes ("s") of data, consisting of 6,387 email messages and 3,679 attachments.  (Dkt. 28 ¶ 28.)  The files included information that NAMSA considers to be confidential and trade secret business information.  (Dkt. 185-4 ¶ 12.)

Pamela attached emails to her May 24, 2024 declaration showing her communications about these exports with NAMSA's IT staff between June 1, 2022 to June 3, 2022.  (*See* Dkt. 218.)  NAMSA's expert Faulkner stated in his February 2, 2024 declaration that the IT staff reported to Pamela (Dkt. 28 ¶ 24), but Pamela stated in her May 24, 2024 declaration that they did not report to her (Dkt. 250 ¶ 21; *see also* Dkt. 185 98:5-9 (Pamela testifying that IT staff did not report to her after the sale because she was no longer the Chief Information Officer)).  Pamela testified during her deposition that she did not seek permission from NAMSA management or leadership to take such files from NAMSA, but that she "submit[ted] an IT request through the proper channels," that is by submitting a ticket to IT, and that "IT management would have known what the IT staff on the site were doing through the ticketing system."  (Dkt. 185 at 98:22-100:9.)  She further testified that, while IT staff reported to her before the sale of APS to NAMSA because she was APS's Chief Information Officer, they did not report to her after the sale.  (Dkt. 185 at 97:17-98:9.)  In short, the parties dispute whether Pamela obtained these files by improper means.  (*See* Dkt. 319 at 111:5-19.)  However, the NAMSA entities stated at the June 28, 2024 hearing on the Motion that the PST file is "not the focus on the spoliation motion" because "they have it."  (Dkt. 319 at 111:5-8.)  It is

unclear whether the earlier export attempts were successful, and in any event, they also are not the subject of this Motion.

**D.      Michael Resigns from NAMSA and Copies Certain Files**

Michael submitted his resignation from NAMSA on July 18, 2022.  (Dkt. 39 ¶ 8; Dkt. 185-1 at 41:17-20.)  Michael's last day at NAMSA was August 19, 2022.  (Dkt. 39 ¶ 8; *see also* Dkt. 242 ¶ 11.)

Based on Faulkner's February 2, 2024 declaration, between May 1, 2022 and August 18, 2022, Michael accessed tens of thousands of files on his NAMSA laptop and copied them to a 5-TB Seagate external drive ("the Michael Seagate Drive").  (Dkt. 28 ¶¶ 34-47.)  Faulkner states in a declaration signed April 26, 2024 that it appears Michael copied more than 26,000 of NAMSA's Controlled Documents, which NAMSA characterizes as documents reflecting its proprietary knowledge of how it executes various activities and carries out many preclinical services, and over 39,000 of NAMSA's biocompatibility files to the Michael Seagate Drive.  (Dkt. 185-3 ¶ 56; *see* Dkt. 185-4 ¶ 13 (describing Controlled Documents).)  However, according to Lanterman, some of the Controlled Documents were copied to the Michael Seagate Drive in December 2020. (Dkt. 247 ¶ 36.)

Consistent with Lanterman's opinion regarding copying in December 2020, Michael stated in a declaration signed under penalty of perjury on May 24, 2022, that "[p]rior to the sale of APS to NAMSA, I had stored many APS documents on a personal Seagate 5-terabyte external hard drive" and after that sale, he "kept these documents on

that Seagate hard drive." (Dkt. 242 ¶ 13.) Michael further stated in the May 24, 2022

declaration:

> Additionally, I do not dispute NAMSA's forensic expert, Kevin Faulkner's, declaration to the extent that he outlines that I interacted with certain files in the weeks leading to my departure from NAMSA. I do not recall all of the specifics of those interactions, but by Mr. Faulkner's testimony, there were several instances where files were created, some of which were not related to NAMSA documents. If I did copy any NAMSA documents at that time, I am confident that it was a limited number. As I testified during my deposition, I saved these documents at that time because they were personally meaningful to me for various reasons. As with any of the NAMSA documents I retained, Pam did not know I had these documents. I stored many of them in a folder I called "APS Nostalgia." I very rarely opened any of these documents and if I did, it was to reminisce on the "old days"—that is, 16 years of building a very successful business from scratch with my wife and friends . . .

(Dkt. 242 ¶ 14.)

As to certain files relating to "business plans and specifications," Michael stated in

the May 24, 2024 declaration that because his company Conforti Holdings owns the

building rented by NAMSA, he was entitled or otherwise permitted to review and

approve any new construction NAMSA wanted to do on the property. (Dkt. 242 ¶¶ 15-

18.) Michael stated: "I needed to have plans to review for approval pursuant to the terms

of the lease, which is why I had the building plans and specifications *for buildings I own*"

and: "There is nothing in the lease agreements that prevents me from retaining a set of as-

built documents for my buildings and my expectation is that the retention of the as-built

drawings is within my rights and is industry standard." (Dkt. 242 ¶ 18.)

Michael testified during his April 12, 2024 deposition that he knew the Controlled

Documents folder contained highly sensitive and confidential materials, and that he was

not permitted to take the files from NAMSA.  (Dkt. 185-1 at 57:2-5, 59:7-13, 60:1-11.)
He further testified that he copied content from the Controlled Documents folder to the
Michael Seagate Drive because they "just had special meaning to" him, and at the time,
they were particular documents he was reminiscing about, and the documents were a
"life's work that he felt akin to" and "just had a hard time getting rid of."  (Dkt. 185-1 at
59:15-25.)

E.    **August 2023 Interactions between NAMSA and the Confortis**

     In approximately late July, NAMSA learned of "Pam or Michael Conforti from
APS starting up a new preclinical business."  (Dkt. 227 at 3.)  Soon thereafter, NAMSA
observed that it had "strong protections in the [purchase agreement] impacting Mike
through Feb 2026; less so with his wife, Pam."  (Dkt. 227 at 2.)

     At some point, NAMSA's CEO Christophe Berthoux and General Counsel Kevin
Slattery asked Michael to attend an August 9, 2023 telephonic meeting with them.  (Dkt.
242 ¶ 26.)  According to Michael, during that call, Berthoux and Slattery "stated that they
suspected I was engaged in assisting Pam in creating a competing business, but they were
unable to articulate a basis for this belief other than the fact that we are married."  (Dkt.
242 ¶ 26.)  Michael states that he "made clear to NAMSA during this call that I was
complying in all respects with my non-competition agreement."  (Dkt. 242 ¶ 26.)  A
lawyer from Dorsey & Whitney LLP ("Dorsey"), which represented Michael at that time,
also attended the call.  (*See* Dkt. 221 at 4 (referencing call).)

     NAMSA's counsel at Latham & Watkins LLP ("Latham") sent a letter on August
28, 2023 "to follow up on recent discussions between our client [NAMSA] and Dr.

Conforti regarding his obligations under his Restrictive Covenant Agreement." (Dkt. 221

at 2.) That letter stated in relevant part:

> This firm [Latham & Watkins] represents North American Science Associates, Inc. ("NAMSA" or the "Company"). We understand that you represent Dr. Michael Conforti. We are writing to follow up on recent discussions between our client and Dr. Conforti regarding his obligations under his Restrictive Covenant Agreement (the "RCA").

* * *

> Earlier this month, NAMSA heard a rumor that Dr. Conforti and his wife, Pamela Conforti, may be preparing to provide pre-clinical veterinary services in Minneapolis in the near future and were even looking at a building near NAMSA for the new business. NAMSA was troubled by Dr. Conforti's potential breach of the RCA and scheduled a meeting with Dr. Conforti to find out whether there was any truth to the rumor. On August 9, 2023, NAMSA's CEO and General Counsel had a conference call with Dr. Conforti and you to discuss Dr. Conforti's and his wife's intentions. We understand that Dr. Conforti denied being "personally" involved in starting a competing business. However, when NAMSA clarified that the rumor was that Ms. Conforti was also starting the competing business, you objected and that the Minnesota Human Rights Act ("MHRA") protects spouses from enforcement of restricted covenants in Minnesota or words to that effect. The call ended soon after.

> Dr. Conforti's response that he was not "personally" involved and your defensive reaction regarding Mrs. Conforti's plans, suggests that Dr. Conforti's wife is planning to open a competing preclinical veterinary services business in Minneapolis. Mrs. Conforti, however, is not a veterinarian and it seems unlikely that she would open an operate a business similar to the one Dr. Conforti sold without his advice, assistance or support. The RCA does not just prohibit Dr. Conforti from preparing to form or operate a competing business himself, it also prohibits him from assisting or supporting anyone else, which includes Mrs. Conforti, from developing or operating any competing business during the Restricted Period. RCA §2.2. Dr. Conforti may not circumvent his obligations under the RCA by forming or operating a competing business through or with his wife.

* * *

> **Please inform Mr. and Ms. Conforti that NAMSA will be monitoring their business activities very closely. If our client has reason to believe that Dr. Conforti is violating, or is about to violate, his obligations under the RCA, whether directly or indirectly, then it will take all appropriate action against him and anyone who is involved to protect its rights**.

(Dkt. 221 at 2, 4-5 (emphasis added); *see also* Dkt. 243.)  The letter also notified Michael of his continuing duty to abide by his confidentiality obligations.  (Dkt. 221 at 4 n.5.)

NAMSA's August 28, 2023 letter questioned the likelihood that Pamela would open a "business similar to" APS without Michael's "advice, assistance or support" because she is not a veterinarian.  (Dkt. 221 at 4.)  The letter did not suggest that Pamela would be breaching any contractual obligations to NAMSA if she did so.  (*See id.*)  Michael received no further communication from NAMSA until NAMSA filed this lawsuit.  (Dkt. 242 ¶ 29.)

Pamela testified at her deposition that she was aware NAMSA had contacted Michael in August 2023, but she was not involved in the conversations.  (Dkt. 185 at 232:19-223:17.)  She testified that she was not aware of any dispute between NAMSA and Michael, but instead was aware "that they had contacted Mike and were looking to confirm rumors they had heard."  (Dkt. 185 at 233:18-23.)  Pamela further testified that she read NAMSA's August 28, 2023 letter sometime "within a few weeks" of when it was received and by that time, knew that NAMSA had concerns that she was planning to open a competing preclinical veterinary services business in Minneapolis.  (Dkt. 185 at 236:2-237:1, 238:10-14.)

Dorsey responded to the August 28, 2023 letter on August 30, 2023.  (Dkt. 242-5.)  The August 30, 2023 letter first addressed NAMSA's belief that Pamela likely would be

relying on Michael to start up a competing business because she was not a veterinarian, pointing out that "there are many preclinical facilities, including NAMSA, that have been founded and operated by non-veterinarians." (Dkt. 242-5 at 2.) The August 30, 2023 letter further stated: "As Mike Conforti made clear to NAMSA on our call earlier this month, he has not and will not violate his RCA." (Dkt. 242-5 at 2.) Pamela reviewed Dorsey's August 30, 2023 letter within a few weeks of it being drafted. (Dkt. 185 at 238:15-22.) As of the end of August 2023, NAMSA had not contacted Pamela regarding any dispute between her and NAMSA. (Dkt. 185 at 240:2-20.)

Pamela testified that she understood that NAMSA was saying in August 2023 that it would take appropriate action against Michael and anyone else involved to protect its rights. (Dkt. 185 at 241:20-242:1.) She also testified that she and Michael were considering a joint defense arrangement at that time in view of this dispute with NAMSA. (Dkt. 185 at 242:3-243:3.) However, Pamela took no steps from August to November 2023 to preserve evidence at this time because was she "was not in a dispute, [and] was not notified that I needed to be preserving any evidence." (Dkt. 185 at 243:17-245:1.)

Pamela stated in her May 24, 2024 declaration that as of the August 9, 2023 meeting between Michael and NAMSA, "my non-competition agreement with NAMSA had concluded at least two months previously on June 3, 2023." (Dkt. 217 ¶ 2.) She further stated:

> At the time of this call, I had not made a decision as to whether I would open a preclinical contract research organization, and when I ultimately decided

to open Phoenix Preclinical Labs, LLC, Dr. Conforti had no involvement in the process.

(Dkt. 217 ¶ 2.)  Instead, based on another declaration Pamela submitted under penalty of perjury, she decided to form a new company to conduct pre-clinical research "[i]n or about September of 2023"—that company being Phoenix Preclinical Labs, LLC ("Phoenix Preclinical").  (Dkt. 250 ¶ 35.)

## F.    NAMSA Circulates a Preservation Notice in December 2023

On December 12, 2023, NAMSA circulated a "Document Preservation and Hold Notice" ("Preservation Notice") to certain of its employees, including Michael Jorgenson and Emily Markuson.  (Dkt. 298-3 at 2; Dkt. 298-4 at 161:23-162:7.)  The Preservation Notice stated, among other things, that the matter arose from Michael's potential violations of his contractual obligations to NAMSA, including certain commitments not to compete, as well as his and Pamela's "potential unlawful use of NAMSA's confidential information and other unlawful conduct."  (Dkt. 286-1 at 3.)  NAMSA also stated in the Preservation Notice that it "anticipates that the dispute may lead to a lawsuit against Dr. and Ms. Conforti."  (Dkt. 286-1 at 3.)

On December 12, 2023, Michael had a call with "Emily Markuson" and "Michael Jorgnsn [sic]."  (Dkt. 298 ¶¶ 7-8; Dkt. 298-5; Dkt. 298-6.)  Text messages sent from Pamela to another person on December 12, 2023 state "Markuson called Mike and we're on the phone with her" and "I'm listening to her and Mike talk – she knows I'm on speaker."  (Dkt. 298 ¶ 9; Dkt. 298-7 at 3-4.)

On December 13, 2023, Michael and Pamela had a call with Dorsey regarding "potential litigation." (Dkt. 184-1, PRIV006394; Dkt. 184-2, PL02040-41; Dkt. 185 at 255:3-4.) Pamela testified that she was "aware that there were rumors swirling," but not of any potential litigation at that time. (Dkt. 185 at 252:1-253:2.) On December 16, 2023, Dorsey emailed "draft declarations" to the Confortis, and Pamela later testified that she "was working on a declaration in December." (Dkt. 184-1, PRIV006412-414; Dkt 184-2, PL02043-45; Dkt. 185 at 255:10-15.) On December 17, 2023, Michael emailed Dorsey and Pamela a "draft declaration." (Dkt 184-2, PL02046-47.) Michael again emailed a "draft declaration" on December 18, 2023. (Dkt. 184-1, PRIV006419-420; Dkt. 184-2 at PL02048.) Pamela also emailed Dorsey a "draft declaration" on December 18, 2023. (Dkt. 184-1, PRIV006424-425.) Pamela and Michael continued to correspond with Dorsey regarding these "draft declarations" and exchanged more drafts that day. (Dkt. 184-1, PRIV006435-440.) Michael's privilege log identified these declarations as protected work product and as prepared in anticipation of litigation. (Dkt. 184-2, PL02044-45, PL02047.) On January 8, 2024, Michael had another call with Dorsey regarding "potential litigation." (Dkt 184-2 at 3, PL02079.)

## G.    NAMSA's "Town Hall" and Michael and Pamela's Destruction of USB Devices in January 2024

Pamela's Counterclaims assert that NAMSA held a "town hall" meeting on January 10, 2024, during which NAMSA made several false and defamatory statements about her and Michael—including that they were "dirty" and had violated their agreements. (Dkt. 142 ¶¶ 35-42.) The Counterclaims further state: "Word of the town-

hall meeting spread quickly.  Ms. Conforti was approached by several people in the MedTech community, who alerted her about NAMSA's false and defamatory statements made against her and Phoenix."  (Dkt. 142 ¶ 43.)

Phoenix Preclinical employee Danielle McCarthy testified during her April 17, 2024 deposition that she had heard from "friends in the industry," specifically NAMSA employees, that NAMSA was conducting an investigation into potential misconduct by Pamela and Michael in "early January of 2024."  (Dkt. 298-8 at 112:4-12.)  McCarthy further testified that she could not recall if she first heard about the investigation before or after January 19, 2024.  (Dkt. 298-8 at 115:2-17.)  McCarthy spoke with Pamela in person after she heard about the investigation, but did not know if Pamela was aware of the investigation before they spoke and could not remember how the conversation went.  (Dkt. 298-8 at 117:5-22.)  In short, the record is unclear as to when Pamela and Michael learned about the "town hall" meeting or "investigation."

Pamela and Michael both testified that they were cleaning their house in January 2024 and destroyed USB drives while doing so.[6]  (Dkt. 185-1 at 105:16-106:1; Dkt. 185 at 161:13-24.)  Pamela testified that she decided to convert their adult son's room into a visitor room given that he was in college, and she asked him to clean up his room over the 2023 "Christmas break" so she could replace his "lofted bunk bed" with a "more traditional bed set up" and put a new dresser in his room.  (Dkt. 185 at 160:7-161:12.)

---

[6]    Although the last access date of each USB drive is known, the precise destruction date is not.  No party has argued the precise date of destruction matters for purposes of this Motion.

Their son is a software development major and had "a lot of IT things in his bedroom."

(Dkt. 185 at 161:17-19.)  Pamela found the USB drives in his room while cleaning it, and

after their son said the drives "were nothing to him," she "plugged them all in to see if

there was anything in terms of family photos or anything that we would need to retain."

(Dkt. 185 at 161:13-22.)  Pamela testified that some of the USB drives were corrupted,

"some didn't have anything of value on them," and she "disposed of them all" by

smashing them with a hammer.  (Dkt. 185 at 161:22-25, 164:10-13.)  Michael testified

they "went through USB drives to see what was on them and destroyed them and g[o]t rid

of them."  (Dkt. 185-1 at 105:16-106:1.)  He also used a hammer "[b]ecause it's an

electronic device and you don't usually, typically, throw electronic devices out without

destroying them."  (Dkt. 185-1 at 107:3-108:1.)  NAMSA's expert Faulkner testified that

he would not throw a USB drive into the trash to dispose of it without reviewing what

was on the drive and "forensically wip[ing]" the drive first.  (Dkt. 225 at 60:11-23.)  He

also acknowledged that "physically damaging" a drive might cause a user (as compared

to a forensic expert like himself) to "think that they're getting rid of their data," although

physical damage "may or may not actually work."  (Dkt. 225 at 60:24-61:15.)

Forensic examination shows that Michael's personal HP laptop and Pamela's

personal laptop were used to access several USB devices in January 2024.  (Dkt. 185-3 at

15 § IV.A.7; Dkt. 185-3 at 16 § IV.B.1.)  Michael connected several USB devices to his

personal HP laptop.  (Dkt. 185-3 at 15 § IV.A.7.)  NAMSA's expert Faulkner

summarized those devices in a table reproduced below.

| Device Type | Serial | Description | Volume Name/ Label | VSN | Recent Date |
|---|---|---|---|---|---|
| Other Disks | | | KINGSTON | 457046 C0 | 10/31/2022 |
| Samsung Phone | RFCR60NLGLX | Michael's S21+ | | | 8/2/2023 |
| Other Disks | 0520000000000046 | General USB Flash Disk USB Device | | FCEF8 F1C | 1/3/2024 |
| Other Disks | 12345678 | Generic Flash Disk USB Device | NO NAME | 68D48C C4 | 1/3/2024 |
| Other Disks | 00ADCA00 | Generic Flash Disk USB Device | | 48A4C AEE | 1/6/2024 |
| Other Disks | 0901f0e4d98c5bd6d69a 73f7365f6a5596de1f5aa 3c001ab5c3427ceee3e3 d0 | USB SanDisk 3.2Gen1 USB Device | USB Drive | 1C6FB1 17 | 1/6/2024 |
| Other Disks | E5C0FF58 | Generic Flash Disk USB Device | | 102BD8 81 | 1/7/2024 |
| Card Reader | 058F84688461 | Generic~ SD/MMC USB Device | | | 1/11/2024 |
| Card Reader | 0123456789ABCDE | NORELSYS 1081CS1 USB Device | | | 1/14/2024 |

(Dkt. 185-3 at 15 § IV.A.7.)  As shown in the table, two devices were connected to
Michael's HP personal laptop on January 3, 2024; two were connected on January 6,
2024; one was connected on January 7, 2024; one was connected on January 11, 2024;
and one was connected on January 14, 2024.  (Dkt. 185-3 at 15 § IV.A.7.)  The January
11 and January 14, 2024 devices are described by NAMSA's expert Faulkner as "Card
Readers" while the five connected in January, before NAMSA's January 10, 2024 "town
hall" meeting, are "Other Disks."  (Dkt. 185-3 at 15 § IV.A.7.)

Michael did not produce these USB devices in this litigation.  He testified that the
"Card Readers" were docking stations, one of which was eaten by one of their two
puppies.  (Dkt. 185-1 at 106:17-23.)  As for the USB drives, Michael testified that he and
Pam looked at some of the USB drives together, some separately, but he could not
remember which they looked at together and which they looked at separately.  (Dkt. 185-
1 at 108:2-23.)  Michael stated in his May 24, 2024 declaration that he destroyed the USB
drives "with a hammer because I couldn't think of a more efficient way to destroy them."
(Dkt. 242 ¶ 34.)

NAMSA's expert Faulkner does not state the USB drives contained any NAMSA information.  (Dkt. 185-3 ¶ 38.)  According to Michael and Pamela's expert Lanterman, the General USB Flash Disk USB Device bearing Serial Number 0520000000000046 had 135 files that were accessed from Michael's laptop between December 17, 2022 and January 3, 2024, and primarily existed within a folder called "FxS," which relate to a software company (FlexSchema) owned by Michael.  (Dkt. 242 ¶ 22; Dkt. 247 ¶ 28; *see also* Dkt. 247-1 at 20-22 (list of file names accessed).)  Lanterman also provided a summary of what was accessed on the other USB devices and opined that "based on the materials that have been provided to me (including my understanding of what constitutes NAMSA data), there is no evidence to indicate that these devices were used to store and access NAMSA Confidential Information."  (Dkt. 247 ¶¶ 28-29.)

NAMSA's expert Faulkner also identified eleven USB devices which had been plugged into Pamela's personal computer.  (Dkt. 185-3 at 16 § IV.B.1.)  His summary table is reproduced below.

| Device Type | Serial | Description | Volume Name / Label | VSN | Recent Date |
|---|---|---|---|---|---|
| Other Disks | 0901be21a0047bd37860 2a736834184084f75a1 0f6b64c2cc1640aa5045d 31 | USB SanDisk 3.2Gen1 | NO NAME | 2ED77DC6 | 6/14/2022 |
| Other Disks | AA6TZHJP30XPWB1T | Lexar USB Flash Drive USB Device | Lexar | 89302B87 | 10/14/2023 |
| Other Disks | 22121210173839445156 07 | General UDisk USB Device | | 00014D30 | 10/24/2023 |
| Card Reader | 058F84688461 | Generic- SD/MMC USB Device | | | 1/2/2024 |
| Other Disks | 001CC0EC2F39EAC095 CB0042 | Kingston DT 100 G2 USB Device | KINGSTON | A0EFA1C1 | 1/11/2024 |
| Other Disks | 0013729945E6EAC0951 30087 | Kingston DT 100 G2 USB Device | KINGSTON | A70DDDDB | 1/11/2024 |
| Other Disks | 6&1fa7b3ee | USB MEMORY BAR USB Device | | | 1/11/2024 |
| Other Disks | SNDK2F07152A447074 07 | SanDisk Cruzer Micro USB Device | | 3B691AFD | 1/11/2024 |
| Other Disks | 07A609030AAEB193 | Memorex Travel Drive CL USB Device | TRAVELDRIVE | 89EF31F1 | 1/11/2024 |
| Other Disks | 60A44C3FAC- DBF160796E0CF6 | Kingston DataTraveler 3.0 USB Device | KINGSTON | | 1/11/2024 |
| Other Disks | 04001217081320202042 | SanDisk Cruzer Glide USB Device | AmericanPre- clinica_Video- Export | 4893F1BD | 1/11/2024 |

(Dkt. 185-3 at 16 § IV.B.1.)

As the table indicates, a "Card Reader" was accessed on January 2, 2024 and seven "Other Disks" were accessed on January 11, 2024.  (Dkt. 185-3 at 16 § IV.B.1.)  The seven USB devices accessed on January 11, 2024 were a Kingston USB drive bearing Serial Number 0013729945E6EAC095130087 and volume number A70DDDDB ("Kingston Drive"), two other Kingston USB drives; a USB Memory Bar USB Device, a Memorex Travel Drive CL USB Device, and two SanDisk Cruzer USB devices, one of which had a volume name of "AmericanPreclinica_Video-Export."  (Dkt. 185-3 at 16 § IV.B.1.)  In addition, a USB SanDisk 3.2Gen1 was accessed on June 14, 2022; a Lexar USB Flash Drive USB Device was accessed on October 14, 2023; and a General UDisk USB device was accessed on October 24, 2023.  (Dkt. 185-3 at 16 § IV.B.1.)

As to the SanDisk Cruzer USB device connected on January 11, 2024 with the volume name "American Preclinica_Video-Export," Pamela testified that it contained only one video, which "was a very old marketing video" that used to be on the APS website, was still available on YouTube, and "talked about the facility probably somewhere circa 2012."  (Dkt. 185 at 162:15-163:23.)  According to Pamela, she "said we don't need this, it's not relevant to anyone at this point because NAMSA has its own website."  (Dkt. 185 at 163:1-2.)  Pamela's brief provided the link for the YouTube video.  (Dkt. 215 at 25 n.5.)  Pamela also testified that she found the other SanDisk Cruzer USB device in February 2024 and this USB device (described by Latham counsel as having "Cabo" as a volume name or label) contained photos of a family trip to Cabo

San Lucas in December 2021, which she provided it to her lawyer in February 2024. (Dkt. 185 at 168:8-20.)

Based on analysis of USB and file/folder artifacts on Pamela's personal laptop, NAMSA's expert Faulkner identified the Kingston Drive as containing NAMSA information. (Dkt. 185-3 ¶¶ 42, 44.) Faulkner states that Pamela opened the following folders from the Kingston Drive on January 11, 2024:

- D:\Biocompatibility\Final Report Templates

- D:\General - Sample Prep (S-GN-SP)

- D:\In-Life Research- Biocompatibility - Animal Care (S-IL-BC-AC)

- D:\In-Life Research - Biocompatibility - Operations (S-IL-BC-OP)

- D:\In-Life Research - Toxicology (S-IL-TX)

- D:\In-Vitro Testing - General (S-IV-GN)

- D:\In-Vitro Testing - Cytotoxicity Operations (S-IV-CY-OP)

- D:\In-Vitro Testing - Hemocompatibility (S-IV-HE-OP)

(Dkt. 185-3 ¶ 42.) On the same day, Pamela opened a Controlled Document named "S-GN-SP-001 Rev B ISO Sample Preparation 09.18.12.docx" from the Kingston Drive. (Dkt. 185-3 ¶ 43.)

Faulkner states in his April 26, 2024 declaration that the opened folders bear "similar names to files and folders on the NAMSA servers" and the "file name matches the name of a file on the NAMSA servers." (Dkt 185-3 ¶¶ 42-43.) However, the NAMSA entities asserted in their brief that the "folders and file names [] precisely match

the names of folders and files on NAMSA's servers." (Dkt. 153 at 14.) At the hearing, Latham counsel first described the folders as "match[ing] NAMSA folders on its confidential repository" (Dkt. 319 at 34:6-7) but later stated:

> I was reminded on the break that I misspoke earlier. I said that those titles matched the names of folders on NAMSA's servers. They are not exact matches. They are close. It was the best Mr. Faulkner was able to do was to line them up, say these look a lot like the folders that NAMSA keeps.
>
> And I was mistaken to say they exactly or to suggest they exactly match before. They don't, but they are very, very close, but that's also part of what illustrates the problem. We just don't know exactly what's on them, and we can't simply go look at the NAMSA versions of the documents to know.

(Dkt. 319 at 110:5-16.)

Lanterman states in his May 24, 2024 declaration that these eight folders and document were created on the Kingston Drive in 2012. (Dkt. 230 ¶ 44.) The eight folders and the file accessed on January 11, 2024 were as follows:

| Folder/File Accessed | File/Folder Name | Date Created on USB drive | Date Modified |
|---|---|---|---|
| 01/11/2024 04:38:12 PM | D:\Biocompatibility\Final Report Templates | 10/03/2012 04:22:34 PM | N/A |
| 01/11/2024 04:38:59 PM | D:\In-Life Research - Biocompatibility - Animal Care (S-IL-BC-AC) | 10/03/2012 04:59:30 PM | N/A |
| 01/11/2024 04:39:01 PM | D:\In-Life Research - Biocompatibility - Operations (S-IL-BC-OP) | 10/03/2012 04:59:48 PM | N/A |
| 01/11/2024 04:39:04 PM | D:\In-Life Research - Toxicology (S-IL-TX) | 10/03/2012 05:00:24 PM | N/A |
| 01/11/2024 04:39:05 PM | D:\In-Vitro Testing - General (S-IV-GN) | 10/03/2012 05:02:16 PM | N/A |
| 01/11/2024 04:39:07 PM | D:\In-Vitro Testing - Cytotoxicity Operations (S-IV-CY-OP) | 10/03/2012 05:02:16 PM | N/A |
| 01/11/2024 04:39:21 PM | D:\General - Sample Prep (S-GN-SP) | 10/03/2012 04:58:12 PM | N/A |
| 01/11/2024 04:39:21 PM | D:\General - Sample Prep (S-GN-SP)\S-GN-SP-001 Rev B ISO Sample Preparation 09.18.12.docx | 10/03/2012 04:58:11 PM | 09/13/2012 03:09:54 PM |
| 01/11/2024 04:39:54 PM | D:\In-Vitro Testing - Hemocompatibility (S-IV-HE-OP) | 10/03/2012 05:02:16 PM | N/A |

(Dkt. 230 ¶ 43.)

Lanterman further states that the Kingston Drive was disconnected from Pamela's laptop 2 minutes and 40 seconds after it was connected.  (Dkt. 230 ¶ 45.)  Lanterman further opines that of the USB devices not produced by Pamela, only two may contain NAMSA data—the 5045 SanDisk Drive containing the PST file and the Kingston Device from which the eight folders and single file from 2012 were accessed.  (Dkt. 230 ¶ 48; *see also id.* ¶ 47.)

Pamela and Michael's expert Lanterman provided the following information regarding the other USB devices that were connected to Pamela's personal laptop.  (Dkt. 230 ¶ 47.)  One of them was the 5045 SanDisk Drive containing the PST file, which was only attached to her personal laptop on June 14, 2022.  (Dkt. 230 ¶ 47.)  One was a Lexar USB Flash Drive USB Device, last connected and only connected to the laptop on October 14, 2023, which contained two .mp4 files.  (Dkt. 230 ¶ 47.)  Another was a General UDisk USB Device, last connected and only connected to the laptop on October 24, 2023, which contained two .mp4 files, each bearing a woman's name as a filename.  (Dkt. 230 ¶ 47.)  Pamela states these video files were used to prepare a tribute video for her mother's memorial service.  (Dkt. 217 ¶ 7.)  Another was a "Generic SD/MMC USB Device" ("highly like[ly] an SD card reader"), which was only connected to Pamela's personal laptop on January 4, 2024 with nothing to indicate files were accessed from this device.  (Dkt. 230 ¶ 47.))  Pamela stated this was a docking station used to allow her laptop to display to a monitor.  (Dkt. 217 ¶ 6.)

Lanterman also discussed three Kingston USB devices that were last connected and only connected to the laptop on January 11, 2024.  (Dkt. 230 ¶ 47.)  One of them was

the Kingston Drive containing the eight folders and file having NAMSA information. (Dkt. 230 ¶ 47.)  As to the second, no files were accessed from Pamela's laptop.  (Dkt. 230 ¶ 47.)  As to the third, the following three folders were accessed from Pamela's laptop on January 11, 2024:

- o  D:\Job Documents
- o  D:\Training Videos
- o  D:\Handouts

(Dkt. 230 ¶ 47.)  NAMSA has not argued that these folders contained NAMSA information or that their destruction constituted spoliation.

There were two SanDisk Cruzer USB devices.  (Dkt. 230 ¶ 47.)  Based on the serial numbers, one of them contained the APS video accessed on January 11, 2024. (Dkt. 230 ¶ 47; Dkt. 185-3 at 16 § IV.B.1.)  The other contained two .jpg photo files accessed on January 11, 2024, and based on the serial number, is the SanDisk Cruzer USB device that Pamela produced in February 2024 containing the Cabo vacation photos. (Dkt. 230 ¶ 47; Dkt. 217 ¶ 8; Dkt. 185-3 at 16 § IV.B.1.)

Finally, Lanterman identified a Memorex Travel Drive CL USB Device and a Memory Bar USB Device.  (Dkt. 230 ¶ 47.)  Both were last and only connected on January 11, 2024, and no files were accessed from those devices.  (Dkt. 230 ¶ 47.)

Lanterman opined that there was no evidence that the Michael Seagate Drive (serial number NABAFEDS) had ever been connected to Pamela's personal laptop.  (Dkt. 230 ¶ 49; *see also* Dkt. 185-3 ¶ 4 (identifying the Michael Seagate Drive by serial number "NABAFEDS").)

24

H.    **NAMSA Files Suit**

NAMSA filed this action against Pamela, Michael, and Phoenix Preclinical on February 2, 2024.  (*See generally* Dkt. 1.)  The initial Complaint alleged that Pamela and Phoenix Preclinical engaged in misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; Michael and Pamela breached their respective Confidentiality Agreements; and Michael engaged in commercial defamation.  (*See generally* Dkt. 1.)  Also on February 2, 2024, the NAMSA entities sued Michael in the District of Delaware asserting claims for breach of contract (where the contract at issue has a Delaware forum selection clause), trade secret misappropriation, and related causes of action.  (*See* Dkt. 81 at 2.)  The Delaware action was transferred to the District of Minnesota and consolidated with the Minnesota action.  (Dkts. 81, 84.)  The NAMSA entities filed an Amended Complaint reflecting this consolidation (Dkt. 97), which is the operative pleading.

I.    **Michael Copies and Destroys Data and Devices over the Weekend of February 2, 2024**

Michael testified at his deposition that on February 2, 2024, after NAMSA filed this lawsuit, he purchased a Lenovo laptop for the sole purpose of wiping the data from Michael Seagate Drive.  (Dkt. 185-1 at 78:18-79:21.)  He testified that he also reset the operating system of the Lenovo laptop, which "didn't make any sense" (presumably because "there was no data on that computer" since its "only purpose" was wiping the Michael Seagate Drive), but he wanted "to make sure that there was no [sic] lingering anything on the computer."  (Dkt. 185-1 at 78:4-21, 80:4-17.)  He also testified that he

had purchased a 2-TB Western Digital Passport Drive.  (Dkt. 185-1 at 83:5-18.)

According to Michael:

> The Seagate hard drive had a compilation of personal and NAMSA-related documents. At the time, again, I was not thinking straight and I wanted to wipe the Seagate drive clean, and, therefore, I transferred all the documents over to Passport. Which made no sense whatsoever, but that's what I did. So now I have a Passport hard drive that has the same material that the Seagate hard drive had on it. Didn't help myself.

(Dkt. 185-1 at 84:9-17.)

Michael further testified that he used a Lenovo computer purchased on February 2, 2024 to wipe some, but not all, of the Seagate files off the Western Digital Passport Drive.  (Dkt. 185-1 at 85:17-87:22.)  He testified that he wanted to retain personal pictures and be more selective in wiping the "things that I knew I should not have had." (Dkt. 185-1 at 88:4-13.)  Michael testified that he knew, when he wiped the Michael Seagate Drive and deleted all the evidence on it, that he had a duty to preserve evidence relevant to the lawsuit he had just been served with.  (Dkt. 185-1 at 63:9-13.)  He also testified that he knew that his agreement with NAMSA included returning its property (including files) when his employment with NAMSA ended and that he failed to do so. (Dkt. 185-1 at 35:6-37:11, 38:10-14.)

After his deposition, the NAMSA entities sent Madel PA ("Madel"), which at some point took over Michael's representation from Dorsey, an email asking about a Lenovo computer having a serial number containing "2861" ("2861 Lenovo Computer"). (Dkt. 184-3 ¶ 5; Dkt. 244-1; Dkt. 244-2.)  In a declaration dated April 22, 2024, Michael stated that he was only asked about "a Lenovo computer" and "your Lenovo computer"

during his deposition, that NAMSA did not ask him about "specific computers" during his deposition even though they had referred to the 2861 Lenovo Computer in a letter marked as an exhibit during his deposition,[7] and that he was not trying to evade the truth during his deposition.  (Dkt. 184-3 ¶¶ 5-6.)  He then stated:

> After the lawsuit was filed, I purchased a Western Digital Passport external hard drive and a Lenovo laptop on February 2, 2024 from Best Buy, which I assume to be the "2861 Computer." I did not put any data on this Computer. I used it only as a passthrough to move documents from the 5-terabyte Seagate hard drive to the Western Digital Passport external hard drive (forensic images of both of which have been produced to NAMSA in this litigation). After transferring all the data from drive to drive, I played around with the settings as the computer was very slow to respond and not functioning well before wiping the Seagate drive and resetting the operating system on the 2861 Computer. After resetting the operating system, the 2861 Computer froze up with a blue screen and was not functional even with turning on and off.
>
> I then disposed of the "2861 Computer" in a construction dumpster in a commercial area near my house in Maple Grove the morning of Saturday, February 3. I regret doing this, too, but again, I was in a state of panic, not doing things that made any sense.

(Dkt. 184-3 ¶¶ 7-8; *see also* Dkt. 242-3 ¶¶ 7-8.)  Michael was unable to retrieve the 2861 Lenovo Computer.  (Dkt. 184-3 ¶ 8.)

Michael then stated in the April 22, 2024 declaration that he had purchased a second Lenovo laptop ("5951 Lenovo Computer"), which he used to wipe the Western Digital Passport Drive.  (Dkt. 184-3 ¶ 7.)  Michael stated that he purchased the 5951 Lenovo Computer on February 3, 2024, acknowledged that NAMSA has questioned the

---

[7]    The Court understands the reference to this letter to be making the point that NAMSA was aware of the 2861 Lenovo Computer before Michael's deposition and therefore could have asked him about it more specifically.

purchase date because a website shows its warranty was activated in November 2023, and said he has "no idea why the warranty would have begun on November 26, 2023."[8]  (Dkt. 184-3 ¶¶ 9-10.)

According to NAMSA's expert Faulkner, the disposal of the 2861 Lenovo Computer means he cannot determine what information "may have been stored, transferred, accessed, or used on this Lenovo computer," and the destroyed data could have provided additional information regarding other USB devices connected to the 2861 Lenovo Computer.  (Dkt. 185-3 ¶ 26.)  Based on Faulkner's review of the Western Digital Passport Drive, between February 3 and February 4, 2024, approximately 120,000 of the over 140,000 files that had been copied onto that drive had been wiped, rendering their data and file metadata irretrievable.  (Dkt. 185-3 ¶ 29.)  Faulkner also opined that an additional wiping process was run on February 4, 2024, which overwrote 264 GB of data on the Western Digital Passport Device.  (Dkt. 185-3 ¶ 29.)  According to Faulkner, "due to this wipe process, I am not able to fully determine what NAMSA Confidential Information may have been stored, transferred, accessed, or used on the 2TB Western Digital drive directly," although he "was able to reconstruct some information about the 2TB Western Digital drive and the files it contained prior to wiping by using some active files and some of the limited, recoverable forensic artifacts that remained on the 2TB Western Digital drive."  (Dkt. 185-3 ¶ 31.)  This includes evidence that Michael may

---

[8]     The NAMSA entities have not made arguments regarding the warranty activation date and the purchase date in connection with this Motion.

have copied more than 26,000 of NAMSA's Controlled Documents and over 39,000 of

NAMSA's biocompatibility files.  (Dkt. 185-3 ¶¶ 48-56.)

Michael provided the Michael Seagate Drive and Western Digital Passport Drive

to Faulkner on February 5, 2024.  (Dkt. 185-3 ¶¶ 16, 30.)  Faulkner also has images of the

5951 Lenovo Computer (which Michael reset on February 4, 2024) and Michael's

personal HP laptop.  (Dkt. 185-3 ¶¶ 4, 18-19.)

Michael testified as to why he wiped the Michael Seagate Drive:

> When the lawsuit came to our attention on Friday, I panicked, lost my mind.
> This was something that I had on this drive that nobody knew about; not even
> Pam, my wife. So, at that point in time, I felt, obviously, not good about
> having material that I shouldn't have had. I felt not good about having
> material that was a secret to my wife, and knew that, based on her activities,
> that this was not going to be good for what she was working towards and
> very excited about in her personal life.

(Dkt. 185-1 at 61:25-62:9.)

In his April 22, 2024 declaration, Michael stated under penalty of perjury he

"deleted these files because he panicked when the lawsuit was filed," in particular

because he "was afraid" that Pamela's business, Phoenix Preclinical, "would be

wrongfully threatened" by his retention of those files—"which she had no idea" that

Michael had kept.  (Dkt. 184-3 ¶ 11.)  He further acknowledged that he had no reason to

have those files, "for the most part, except my own nostalgia about build[ing] and

running American Preclinical Services ('APS') for over 16 years."  (Dkt. 184-3 ¶ 11.)  He

further stated that he has never shared any APS or NAMSA documents with Pamela or

anyone associated with, working with, or employed by Phoenix Preclinical.  (Dkt. 184-3

¶ 12.)

Pamela was in Illinois with her father, who was undergoing cancer treatment, during the weekend of February 2, 2024, when Michael engaged in this conduct.  (Dkt. 242 ¶ 31.)  Michael stated under penalty of perjury that Pamela had no role in his activities during the weekend of February 2, 2024.  (Dkt. 242 ¶ 31.)  Pamela stated under penalty of perjury that she did not hear about Michael's actions until she returned to Minnesota from assisting her father, on February 5, 2024.  (Dkt. 217 ¶ 15.)

## J.    Michael's iPhone

Michael had his iPhone imaged on February 13, 2024 in "an abundance of caution."  (Dkt. 242 ¶ 35.)  NAMSA's expert Faulkner states that all text messages on the iPhone had been deleted before imaging.  (Dkt. 185-3 ¶ 34.)  Faulkner was able to ascertain that Michael's iPhone had sent/received approximately 44,000 text messages between when it was first put into use on April 16, 2023 and February 13, 2024, when it was turned in for purposes of this litigation.  (Dkt. 185-3 ¶ 34.)  But "[t]he exact date and time when text messages were deleted is unknown."  (Dkt. 185-3 ¶ 35.)  Based on Faulkner's forensic review, one chat thread had an artifact showing that the most recent text message was sent on February 2, 2024, and two other chat threads had artifacts showing their most recent message was sent on February 10, 2024.  (Dkt. 185-3 ¶ 35.)  "A total of 25 chat threads" (including those three) had artifacts indicating their most recent message was sent after December 13, 2023.  (Dkt. 185-3 ¶ 35.)  From this, Faulkner could conclude that those chat threads had been deleted after the date of the most recent message, e.g., that the 25 chat threads had been deleted on or after December 13, 2023.  (*See* Dkt. 185-3 ¶¶ 35-37.)

When questioned about this, Michael testified that "[t]here shouldn't have been any text messages on [his] phone" because he deletes his text messages after he receives a text, and this has "always" been his practice. (Dkt. 185-1 at 89:7-90:20; *see also* Dkt. 242 ¶ 35.) He further testified that he did not delete any text messages during the period he was panicked about this lawsuit. (Dkt. 185-1 at 90:21-24.)

## K.   Michael and Pamela's Limited Waiver of the Marital Communications Privilege

Because the NAMSA entities seek to impute the consequences of Michael's conduct the weekend of February 2, 2024 to Pamela (and thus to Phoenix Preclinical), the Court revisits the Confortis' limited waiver of the marital communications privilege. On April 5, 2024, Michael and Pamela agreed to waive the marital communications privilege for three categories of communications between them, one of which was "regarding alleged 'spoliation' of evidence up to and including the date and time it allegedly occurred with respect to that specific alleged 'spoliation.'" (Dkt. 130-3 at 5-6; Dkt. 130-7 at 2.) This means that to the extent Michael and Pamela had communications regarding the alleged spoliation, those communications before and including the date of each such instance are and were discoverable by NAMSA.

## L.   Specific Sanctions Sought

The NAMSA entities seek sanctions in the form of adverse inferences as to Michael and Pamela and "terminating sanctions" as to Michael for the alleged spoliation. (Dkt. 153 at 7-8.) All of the alleged spoliation relates to electronically stored information ("ESI"), namely the information contained on the USB drives destroyed by Pamela and

Michael, Michael's text messages, and the information contained on the Lenovo Computers, the Michael Seagate Drive, and the Western Digital Passport Drive. (*See* Dkt. 153 at 24-26 (NAMSA entities identifying "intentionally destroyed evidence").)

As to the adverse inferences, the NAMSA entities shifted their request from the specific inferences sought in their papers to a more general adverse inference against Michael and Pamela that the evidence destroyed was favorable to NAMSA and unfavorable to Defendants, stating this was sufficient to cure the prejudice.[9] (*Compare*

---

[9]    The NAMSA entities originally sought the following adverse inferences as to Michael:

> 1. Dr. Conforti had a duty to preserve evidence relating to NAMSA's claims. After that duty arose, he intentionally destroyed and thus failed to preserve such evidence. These actions constitute spoliation.
> 2. The evidence spoliated by Dr. Conforti was favorable to NAMSA and unfavorable to Defendants, including because it would show:
>     a.  The spoliated evidence contained confidential, proprietary, and trade secret information belonging to NAMSA;
>     b.  Dr. Conforti misappropriated NAMSA's confidential, proprietary, and trade secret information for prohibited purposes, including to support the competitive business of Phoenix; and
>     c.  In doing so, Dr. Conforti breached his RCA and Employment Agreement.

As to Pamela, the NAMSA entities also originally sought the following adverse inferences:

> 1. Ms. Conforti had a duty to preserve evidence relating to NAMSA's claims. After that duty arose, she intentionally destroyed and thus failed to preserve such evidence. These actions constitute spoliation.
> 2. The evidence spoliated by Ms. Conforti was favorable to NAMSA and unfavorable to Defendants, including because it would show:
>
>     a.  The spoliated evidence contained confidential, proprietary, and trade secret information belonging to NAMSA;

(Dkt. 153 at 29-30, *with* Dkt. 319 at 46:25-48:10.)  This more general request still seeks an adverse inference that the evidence destroyed by Michael was unfavorable to Pamela and Phoenix Preclinical.  (Dkt. 319 at 50:24-51:4.)  The "terminating sanction" sought against Michael is default judgment.  (Dkt. 153 at 30-34.)

## II.    LEGAL STANDARD

This case involves claims under both federal and state law.  (*See generally* Dkt. 97.)  Nevertheless, "federal law applies to the imposition of sanctions for the spoliation of evidence."  *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012).

Rule 37 of the Federal Rules of Civil Procedure governs spoliation of ESI, as it is "intended to preempt use of other sources of sanctions – such [as] state law or the long-established 'inherent power' doctrine."  *Alsadi v. Intel Corp.,* No. CV-16-03738-PHX-DGC, 2020 WL 4035169, at *3 (D. Ariz. July 17, 2020) (quoting *Stevens v. Brigham Young University-Idaho*, No. 4:16-CV-530-BLW, 2019 WL 6499098, at *3 (D. Idaho Dec. 3, 2019)); *see also* 28 U.S.C. § 2072(b) ("All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."); Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment ("Federal circuits have established significantly different standards for imposing sanctions or curative measures on parties who fail to preserve [ESI] . . . Rule 37(e) . . . authorizes and specifies measures

---

        b.  Ms. Conforti misappropriated NAMSA's confidential, proprietary, and trade secret information for prohibited purposes, including to support the competitive business of Phoenix; and

        c.  In doing so, Ms. Conforti breached her Employment Agreement.

(Dkt. 153 at 29-30.)

a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures. It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used."); *Blazer v. Gall*, No. 1:16-CV-01046-KES, 2019 WL 3494785, at *2 (D.S.D. Aug. 1, 2019) (noting that application of Rule 37(e) "forecloses reliance on inherent authority"); *see also Schlafly v. Eagle F.*, 970 F.3d 924, 936 (8th Cir. 2020) (stating a "court ordinarily should rely on the Federal Rules rather than its inherent power" to impose sanctions) (citation omitted); *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 899 (8th Cir. 2009) (stating "the guidance from the Court is clear, and we emphasize that the better practice is to apply Rule 37 where appropriate and not allow an exercise of inherent power to obscure the Rule 37 analysis") (cleaned up).

However, if a court determines "in its informed discretion" that a Rule is "not up to the task" to address bad-faith conduct, then it "may safely rely on its inherent power" to impose sanctions. *Schlafly*, 970 F.3d at 936 (cleaned up). In this case, "the best practice is to keep the structured analysis for a particular rule separate from the relatively unstructured analysis associated with inherent authority." *Sentis*, 559 F.3d at 900.

Rule 37(e) provides:

(e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

34

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

    (A) presume that the lost information was unfavorable to the party;

    (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). "The rule does not apply when information is lost before a duty to preserve arises" "in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment.

As to Rule 37(e)(1), a court may award sanctions under that subdivision only if: (1) the information at issue should have been preserved in the anticipation or conduct of litigation; (2) a party failed to take reasonable steps to preserve the information; (3) information was lost as a result and the information cannot be restored or replaced by additional discovery; and (4) "upon finding prejudice to another party from loss of the information." Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment; *see also Kramer v. Ford Motor Co.*, No. 12-1149 (SRN/FLN), 2016 WL 7163084, at *2 (D. Minn. Feb. 3, 2016) (rejecting sanctions under Rule 37(e)(1), finding that "[a]s Plaintiffs have been given the information requested, it is clear that the information is (1) not lost, and (2) can be restored or replaced through additional discovery"). "Prejudice likely exists from lost or destroyed ESI if the lost or missing evidence would be different or more helpful to the party claiming spoliation than the evidence already in existence," but "prejudice does not exist when there is no support for the speculation that

35

the lost evidence would have affected the litigation." *FA ND CHEV, LLC v. Kupper*, No. 1:20-CV-138, 2022 WL 16699304, at *3 (D.N.D. Aug. 31, 2022) (cleaned up). Destroyed evidence does not need to contain information that can be classified as a "smoking-gun" for prejudice to exist. *See Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004). In some cases, prejudice can be satisfied by the nature of the evidence itself. *Id.*

Sanctions awarded under Rule 37(e)(1) should be no greater than necessary to cure any resulting prejudice. *See* Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment. The range of sanctions available under Rule 37(e)(1) is "quite broad" and "[m]uch is entrusted to the court's discretion." *Id.*

As to Rule 37(e)(2), this subdivision "does not include a requirement that the court find prejudice to the party deprived of the information" to impose a sanction of an adverse inference or default judgment. *See* Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment. "This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment.

However, Rule 37 (e)(2) does require "a finding that the party acted with the intent to deprive another party of the information's use in the litigation." *Id.* "This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial." *Id.* It is

important to emphasize that "[n]egligent or even grossly negligent behavior does not logically support that inference." *Id.*; *see also EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.,* No. 3:12-CV-00463, 2018 WL 1542040, at *18 (M.D. Tenn. Mar. 29, 2018) ("Rule 37(e)(2)'s drafters included its intent standard with a specific purpose: to reject cases that had authorized an adverse-inference instruction 'on a finding of negligence or gross negligence.'") (quoting Rule 37(e)(2) advisory committee's note to 2015 amendment); *Wolff v. United Airlines, Inc.*, No. 1:18-CV-00591-RM-SKC, 2019 WL 4450255, at *4 (D. Colo. Sept. 17, 2019) (declining to impose a severe sanction under Rule 37(e)(2) where Plaintiff "produced no evidence to suggest that Defendant, when failing to suspend its automatic deletion of emails, acted with the intent to deprive Plaintiff of that evidence") (citations omitted).

The Eighth Circuit has explained that Rule 37(e)(2) requires "a finding" of "intent to deprive" and does so for a specific reason: "Precisely because deciding a case based on hypothesized evidence is strong medicine, Federal Rule of Civil Procedure 37(e)(2)(A) expressly states that an adverse presumption requires a finding that electronically stored information was lost because one party 'acted with the intent to deprive another party of the information's use in the litigation.'" *Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018) (citation omitted); *see also Scott v. Plummer*, No. 5:19-CV-00079 BSM-PSH, 2020 WL 13801523, at *1 (E.D. Ark. Jan. 29, 2020) (citation omitted) ("Scott has also not shown that the defendants acted in bad faith by destroying the video, a showing necessary to impose stronger sanctions under Rule 37(e)(2) such as a spoliation instruction or default judgment.").

"However, because intent 'rarely is proved by direct evidence,' a court imposing spoliation sanctions 'has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors.'" *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 657 B.R. 475, 485 (D. Minn. 2022) (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)); *see also Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019) (same). In sum, the intent to deprive (sometimes referred to as "bad faith") "can be proved indirectly" and a party need not "find a smoking gun" before seeking sanctions under this section. *Auer*, 896 F.3d at 858. "[A] party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer that [the] party purposefully destroyed evidence to avoid its litigation obligations." *Est. of Hill by & through Grube v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2022 WL 1464830, at *11 (E.D. Wash. May 9, 2022) (citation omitted).

Sanctions in the form of an adverse inference instruction or entry of default judgment are extreme and should not be given lightly. *Rao v. St. Jude Med. S.C., Inc.*, 631 F. Supp. 3d 678, 712 (D. Minn. 2022) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219-20 (S.D.N.Y. 2003)). This is because "[i]n practice, an adverse inference instruction often ends litigation-it is too difficult a hurdle for the spoliator to overcome." *Id.* The advisory committee's notes to the 2015 amendment to Rule 37(e)(2) state: "Courts should exercise caution, however, in using the measures specified in (e)(2)." Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment. Indeed, "[f]inding an intent to deprive another party of the lost information's use in the

38

litigation does not require a court to adopt any of the measures listed in subdivision (e)(2)." *Id.*

"The initial determination the court must make is a determination of when the defendant's duty to preserve evidence was triggered." *E\*Trade Secs. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 587 (D. Minn. 2005) (citation omitted). "A party is obligated to preserve evidence once the party knows or should know that the evidence is relevant to future or current litigation." *Paisley Park*, 330 F.R.D. at 232 (citations omitted); *see also Cooley v. Target Corp.,* No. 20-2152 (DWF/DTS), 2022 WL 3647859, at \*3 (D. Minn. Aug. 24, 2022) (same), *appeal dismissed*, No. 22-3251, 2023 WL 3115399 (8th Cir. Jan. 18, 2023); *The Valspar Corp. v. Millennium Inorganic Chems., Inc.*, No. 13-CV-3214(ADM/LIB), 2016 WL 6902459, at \*4 (D. Minn. Jan. 20, 2016) ("The courts of this District have phrased this standard as holding the obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation.") (cleaned up). This duty arises when litigation is "reasonably foreseeable." Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment.

"The duty to preserve evidence extends to those persons likely to have relevant information – the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary." *Rao*, 631 F. Supp. 3d at 712 (cleaned up). This duty "must be viewed from the perspective of the party with control of the evidence." *Id.* at 711 (quoting *Paisley Park*, 330 F.R.D. at 233); *see also Vogt v. MEnD Corr. Care, PLLC*, No. 21-CV-1055 (WMW/TNL), 2023 WL 2414551, at \*8 (D. Minn. Jan. 30, 2023), *R. & R. adopted sub nom.*, 2023 WL 2414531 (D. Minn. Mar. 8, 2023). "The

court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation." Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment. As noted by the advisory committee:

> A variety of events may alert a party to the prospect of litigation. Often these events provide only limited information about that prospective litigation, however, so that the scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.

*Id.*

To be clear, Rule 37(e) "recognizes that 'reasonable steps' to preserve suffice; it does not call for perfection." *Id.*; *see also Paisley Park*, 330 F.R.D. at 233 ("The next question the Court must consider is whether the RMA Defendants took reasonable steps to preserve relevant ESI. Even when litigation is reasonably foreseeable, a party is under no obligation to keep every shred of paper, every e-mail or electronic document and every backup tape.") (marks and citation omitted). That said, "when litigation is imminent or has commenced, a party cannot 'blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy.'" *Kelley as Tr. of BMO Litig. Tr.*, 657 B.R. at 487 (quoting *E*Trade Secs.*, 230 F.R.D. at 589).

"If spoliation is determined, the Court has broad discretion in determining an appropriate sanction and considers the culpability of the party and timing of the actions." *Peterson v. Washington Cnty.*, No. 18-2640 (DWF/ECW), 2021 WL 2686119, at *3 (D. Minn. June 30, 2021) (citing *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 268 (8th

Cir. 1993)).  Due to the severity of sanctions under Rule 37(e)(2), when discovery is

ongoing, courts have found it appropriate to defer ruling until the record is complete:

> The Court believes that Plaintiffs' request for an order presuming the evidence destroyed was unfavorable to the RMA Defendants and/or for an adverse inference instruction may well be justified. But given the fact that discovery is still on-going, the record is not yet closed, and the case is still some time from trial, the Court believes it more appropriate to defer consideration of those sanctions to a later date, closer to trial. *See Monarch Fire Protection Dist. v. Freedom Consulting & Auditing Servs., Inc.*, 644 F.3d 633, 639 (8th Cir. 2011) (holding that it is not an abuse of discretion to defer sanction considerations until trial). At that point, the trial judge will have the benefit of the entire record and supplemental briefing from the parties regarding the parameters of any such instruction or presumption.

*Paisley Park*, 330 F.R.D. at 237.

Finally, under some circumstances, a court may impute the destruction of evidence

to parties who did not personally cause the spoliation under an agency theory.  *See Vogt*,

2023 WL 2414551, at *13; *see also Danielson v. Huether*, No. 4:18-CV-04039-RAL,

2021 WL 217706, at *6 n.7 (D.S.D. Jan. 21, 2021) ("Courts ordinarily analyze the

attribution of fault to one party for another's spoliation under principles of agency"),

*aff'd*, No. 21-1556, 2022 WL 259455 (8th Cir. Jan. 28, 2022); *Am. Builders &

Contractors Supply Co. v. Roofers Mart, Inc.*, No. 1:11-CV-19 (CEJ), 2012 WL 2992627,

at *6 (E.D. Mo. July 20, 2012) ("The Court agrees that general agency principals [sic]

apply in determining whether to impose sanctions against a party for spoliation by its

employees.").

## III.    ANALYSIS

### A.    When the Duty to Preserve Began

A prerequisite for Rule 37(e) sanctions is that the ESI at issue "should have been preserved in the anticipation or conduct of litigation."  Fed. R. Civ. P. 37(e).  The NAMSA entities first argue that Michael and Pamela's duty to preserve in this case arose no later than August 9, 2023, when Michael and his Dorsey counsel "spoke directly with NAMSA's CEO and General Counsel about NAMSA's concerns that *both* Dr. and Ms. Conforti were engaging in contractually and legally prohibited activities."  (Dkt. 153 at 23.)  Michael and Pamela disagree.  Michael argues that in August 2023, NAMSA only communicated a mere suspicion that he was helping Pamela create a competing business, but NAMSA's sole basis for this belief was "the fact that they are married" and he made clear at that time that he was complying with his non-competition agreement.  (Dkt. 241 at 8-9.)  Pamela makes the point that she did not attend this August 9, 2023 meeting.  (Dkt. 215 at 25.)  She also argues that while this meeting "*might*" have put her on notice of a future claim by NAMSA alleging that Michael was in breach of his non-competition agreement, it in no way gave her notice that NAMSA was contemplating suing her for misappropriation of trade secrets or suggested that she had a duty to preserve evidence potentially relevant to any such claim.  (*Id.*)

The August 28, 2023 letter sent by Latham counsel after the August 9, 2023 meeting indicates that even NAMSA did not believe litigation was "reasonably foreseeable."  (*See* Dkt. 221.)  This letter states that NAMSA contacted Michael because NAMSA had heard a "rumor" that Michael and Pamela "may be preparing to provide

pre-clinical veterinary services in Minneapolis in the near future and were even looking

at a building near NAMSA for the new business." (*Id.* at 4.)  This "rumor" prompted

NAMSA to schedule a meeting with Michael.  (*Id.*)  In the letter, NAMSA acknowledged

Michael's denials that he was involved in Pamela's business plans, reminded Michael of

his obligations under the RCA, and closed with a request that Dorsey counsel inform

Michael and Pamela "that NAMSA will be monitoring their business activities very

closely." (*Id.* at 4-5.)  The August 28, 2023 letter also cautioned that if NAMSA "has

reason to believe that Dr. Conforti is violating, or is about to violate, his obligations

under the RCA, whether directly or indirectly, then it will take all appropriate action

against him and anyone who is involved to protect its rights." (*Id.* at 5.)

These statements make clear that NAMSA did not believe it had a basis to file suit

against Michael and Pamela at that time or that litigation was imminent.  This belief is

confirmed by the fact that NAMSA did not circulate a Preservation Notice in August

2023, but instead waited until December 12, 2023.  (Dkt. 298-3 at 2.)  NAMSA has not

identified any reason why, when NAMSA did not believe litigation was imminent based

on the August 2023 meeting and correspondence, Michael and Pamela would have done

so.  The Court concludes that Michael and Pamela did not have a duty to preserve

relevant evidence in anticipation of litigation in August 2023.  *See Keller v. Pepsi

Bottling Grp., Inc.*, No. CV 07-1473 (MJD/AJB), 2007 WL 9735622, at *1, 5 (D. Minn.

Aug. 27, 2007) (finding letter threatening criminal proceedings based on failure to timely

give plaintiff his vacation pay did not "constitute[] a clear sign of imminent litigation" for

lawsuit alleging "(1) obstruction of workers' compensation benefits, (2) retaliation for

filing workers' compensation claims, (3) failure to pay wages/vacation pay, (4) failure to timely pay wages/vacation pay, (5) failure to permit inspection of personnel record, (6) defamation, and (7) intentional infliction of emotional distress" where "[t]he letter stated that Plaintiff's counsel wanted to review Plaintiff's personnel file to examine a potential civil claim, but a letter sent the next day to Defendants only discussed vacation pay" and the plaintiff never asked to review his file over the next two and a half months).

The NAMSA entities contend, in the alternative, that Michael and Pamela's duty to preserve evidence arose as of December 2023. (Dkt. 153 at 9; Dkt. 319 at 15:13-15.) This is based on the following events on December 12-13, 2023:

- On December 12, 2023, NAMSA circulated a Preservation Notice to certain of its employees, including Jorgenson and Markuson, regarding the Confortis, and stating that "the matter" arose from Michael's potential violations of his contractual obligations to NAMSA, including certain commitments not to compete, and also his and Pamela's "potential unlawful use of NAMSA's conditional information and other unlawful conduct." (Dkt. 286-1 at 3; Dkt. 298-3 at 2.)

- Michael and Pamela spoke with Jorgenson and Markuson on the same day that NAMSA issued the Preservation Notice. (Dkt. 298 ¶¶ 7-9; Dkt. 298-5; Dkt. 298-6; Dkt. 298-7.)

- The day after NAMSA issued the Preservation Notice, on December 13, 2023, Michael and Pamela met with Dorsey regarding "potential litigation" and, within the next few days, were working on draft declarations over which they assert the work-product protection. (Dkt. 184-1 at 2-4, PRIV006394-95, 6412-14, PRIV006419-20, PRIV006424-26, PRIV006435-39; Dkt. 184-2 at 2, PL02040-41, PL02043-48; Dkt. 185 at 254:2-22, 255:3-15.)[10]

---

[10]    It appears that the parties exchanged their document preservation notices with an agreement that doing so would not constitute a waiver of the attorney client privilege (Dkt. 319 at 14:11-17), but the Confortis have not filed any preservation notice or provided any for *in camera* review. During the June 28, 2024 hearing, the Court

Based on the record, the Court finds that Pamela and Michael reasonably foresaw litigation as of December 2023. In addition to their conversations with Jorgenson and Markuson on December 12, 2023, the day NAMSA issued its Preservation Notice, Pamela and Michael had a conversation with Dorsey counsel about "potential litigation" the next day, began drafting declarations as of December 16, 2023, and have asserted that those December 2023 declarations are protected by the work product doctrine. Courts have concluded that the duty to preserve attaches on the date a party begins asserting work product protection. *See Escamilla v. SMS Holdings Corp.*, No. 09-2120 (ADM/JSM), 2011 WL 13243580, at *37 (D. Minn. June 28, 2011) ("Under this timeline, this Court finds that SMS's duty to preserve relevant documents was triggered as early as March 11, 2008, when Zuniga filed her charge, as that is the date that SMS has asserted the work product privilege attached, and certainly no later than August 2009, when she commenced her suit. Yet, SMS took no steps to preserve Gonzalez's work computer at either time. Instead, it was not until April 2010, that SMS located and preserved Gonzalez's work computer, and it took no steps to preserve the information on the SMS file and print server and email Exchange server until July 2010. In short, SMS cannot have it both ways. It cannot assert that it was anticipating litigation as early as March 2008, upon the filing of the EEOC charge, and then maintain it had no duty to preserve documents bearing on that anticipated litigation."), *aff'd*, No. 09-2120

---

discussed provision of the draft declarations for *in camera* review with Dorsey counsel and directed counsel to meet and confer regarding any agreements as to waiver. (Dkt. 319 at 116:8-118:17.) The draft declarations were not provided to the Court for *in camera* review.

ADM/JSM, 2011 WL 5025254 (D. Minn. Oct. 21, 2011); *see generally PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP*, 305 F.3d 813, 817 (8th Cir. 2002) ("In order to protect work product, the party seeking protection must show the materials were prepared in anticipation of litigation, i.e., because of the prospect of litigation.").  Here, Michael and Pamela cannot reasonably assert they did not anticipate litigation when they have asserted work product protection—which requires the materials at issue to be prepared in anticipation of litigation—over documents drafted on December 16, 2023 and when they were speaking to Markuson and Jorgenson the same day NAMSA issued its Preservation Notice to its employees (including Markuson and Jorgenson) and speaking with Dorsey counsel the next day.

Nevertheless, Pamela argues she did not have a duty to preserve as of December 2023 because the only potential claim she and Michael were aware of was a claim that Michael was breaching his non-competition agreement and she did not know that NAMSA might sue her until NAMSA actually did so on February 2, 2024.  (*See* Dkt. 215 at 25-27; *see also* Dkt. 217 ¶¶ 12-13.)  This is really a two-part argument, first that Pamela did not know NAMSA might sue her at all and second that any duty to preserve was limited by the type of claim she thought NAMSA was asserting against Michael.  Consistent with Pamela's second argument, Michael also suggests the scope of any duty to preserve before February 2, 2024 should be limited because: "Trade secrets and confidential information were never discussed, and we had no clue that NAMSA had any concerns about these issues."  (Dkt. 242 ¶ 29.)

46

The Court is not persuaded by Pamela's argument that she had no duty to preserve because she did not realize in December 2023 she might be a defendant. It is true that as of August 2023, NAMSA appeared to be concerned only about Michael's potential breach of contract, as demonstrated by the fact that NAMSA did not seek a meeting with Pamela and did not mention any alleged breach by Pamela in the August 28, 2023 letter—even though it was Pamela's business activities that gave rise to NAMSA's concerns. But "[t]he duty to preserve evidence extends to those persons likely to have relevant information – the key players in the case." *Rao*, 631 F. Supp. 3d at 712 (citation omitted). Pamela—whose anticipated business was a topic of the August 9, 2023 meeting and subsequent correspondence—clearly would be a key player in a potential future case. Indeed, NAMSA threatened to take action in the August 28, 2023 letter against Michael and "anyone who is involved" if it believed he was violating his obligations under the RCA. (Dkt. 221 at 4-5.) While the Court finds that litigation was not reasonably foreseeable as of August 2023, NAMSA's "anyone who is involved" statement at that time provides context for the events of December 2023. Moreover, Michael's declaration acknowledges that he and Pamela "believed that all of NAMSA's allegations were about Pam, me, or both of us violating our non-compete restrictions." (Dkt. 242 ¶ 29.) This contradicts Pamela's argument that she did not know NAMSA might sue her, at least as of December 2023.

The Court also rejects Pamela and Michael's distinction between potential non-compete claims and the trade secret and other claims asserted in NAMSA's February 2, 2024 Complaint. The Court understands the Confortis to be arguing that they did not

have a duty to preserve evidence before February 2, 2024 unless it was relevant to a non-compete claim against Michael. Even if the Court accepted that the only claim contemplated by Pamela and Michael in December 2023 was a non-compete claim against Michael, the Court does not see how this duty would not include preservation of NAMSA information retained by Michael and Pamela after their employment ended. Whether Michael or Pamela had kept NAMSA information is plainly relevant to such a claim. *See Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 952, 954 (D. Minn. 1999) (stating defendant former employee "either knew or should have known that the Lexis-Nexis material he possessed was relevant to reasonably foreseeable litigation" when he started work at direct competitor a week after leaving plaintiff Lexis-Nexis). To the extent there could be some evidence relevant to a trade secret claim but not a non-compete claim against Michael, Michael and Pamela have not articulated any reason why the NAMSA information at issue in this Motion falls into that category. Moreover, Michael and Pamela—while not lawyers—are both highly educated and experienced business professionals who were consulting with Dorsey regarding potential litigation as of December 13, 2023. *See* Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment ("The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation."); *see generally In re Uponor, Inc.*, *F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2325798,

at *3 (D. Minn. June 19, 2012) ("As a general rule, an attorney's knowledge is imputed to [their] client."), *aff'd,* 716 F.3d 1057 (8th Cir. 2013).

For all these reasons, the Court finds that Michael and Pamela's duty to preserve evidence relevant to NAMSA's breach of non-compete and confidentiality obligations and trade secret misappropriation claims began no later than December 13, 2023.

## B.    USB Drives Destroyed in January 2024

The first instance of alleged spoliation occurred in January 2024, when, as the NAMSA entities put it, Michael and Pamela "smashed *with hammers* numerous USB devices that had interacted with computers they used to access stolen NAMSA information in the weeks and months prior."[11]  (Dkt. 153 at 24.)  NAMSA contends that "the timing of their destruction—well after they were aware of and preparing for future litigation—gives rise to a presumption of bad faith intent in destroying them."  (*Id.* at 28.)

The Court begins with this "presumption of bad faith" argument.  The NAMSA entities cite *E\*Trade Securities LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 589 (D. Minn. 2005), to support their argument that the Court may presume the requisite intent from the timing of the destruction.  (*Id.* at 28.)  It is true that in *E\*Trade*, the court relied

---

[11]    The NAMSA entities make much of the fact that the Confortis destroyed the USB drives with a hammer.  The Court does not find the use of a hammer particularly persuasive as to an intent to deprive **the NAMSA entities** of information—rather than anyone else who might find the USB devices in the trash.  The NAMSA entities have never articulated why smashing the devices with a hammer before throwing them in the trash is so much more damning than throwing the USB drives in an operable form in the trash.  Either way, the USB devices would be unavailable to NAMSA.  In any event, based on NAMSA's expert Faulkner's testimony, it is not unreasonable for an innocent person to review data on a USB drive and try to delete the information it contains before disposing of the drive.  (*See* Dkt. 225 at 60:11-61:15.)

on *Stevenson v. Union Pacific Railroad Co.* for the proposition that where "the destruction of evidence occurs after litigation is imminent or has begun, no bad faith need be shown by the moving party."  230 F.R.D. at 589 (citing *Stevenson*, 354 F.3d at 747-48).  However, *Stevenson* did not go so far with respect to a presumption as the *E\*Trade* language suggests or NAMSA argues.  Rather, the Eighth Circuit in *Stevenson* identified the timing of the destruction as one factor—among others—that a court should consider when making a "bad faith" determination for spoliation purposes:

> The district court's bad faith determination is supported by Union Pacific's act of destroying the voice tape pursuant to its routine policy in circumstances where Union Pacific had general knowledge that such tapes would be important to any litigation over an accident that resulted in serious injury or death, and its knowledge that litigation is frequent when there has been an accident involving death or serious injury. While these are quite general considerations, an important factor here is that a voice tape that is the only contemporaneous recording of conversations at the time of the accident will always be highly relevant to potential litigation over the accident. We conclude that this weighs heavier in this case than the lack of actual knowledge that litigation was imminent at the time of the destruction. Additionally, the record indicates that Union Pacific made an immediate effort to preserve other types of evidence but not the voice tape, and the district court noted that Union Pacific was careful to preserve a voice tape in other cases where the tape proved to be beneficial to Union Pacific. The prelitigation destruction of the voice tape in this combination of circumstances, though done pursuant to a routine retention policy, creates a sufficiently strong inference of an intent to destroy it for the purpose of suppressing evidence of the facts surrounding the operation of the train at the time of the accident.

354 F.3d at 747-48.

Further, the *Stevenson* decision is more nuanced that *E\*Trade* suggests.  The sanctions imposed by the district court and upheld by the Eighth Circuit in *Stevenson* were "for the destruction of track maintenance records after the commencement of

litigation and the filing of the plaintiffs' request for production of documents on October 25, 1999," where the "most relevant" records would have been available as of the date of the request for production. *Id.* at 749. The Eighth Circuit also concluded that a finding of bad faith based on pre-litigation destruction of track records was an abuse of discretion where: "Union Pacific knew that litigation is possible when there has been a serious accident but did not consider whether, when the prelitigation destruction was occurring, there had been any notice in this case of potential litigation or that the track maintenance would be an issue or an alleged cause of the accident," and "Union Pacific was not on notice that the track maintenance records should be preserved until it received the October 1999 request for production of documents, and the condition of the track was not formally put into issue until the second amendment to the complaint in May 2000." *Id.*

There is another reason why reliance on *Stevenson* and *E\*Trade* is not persuasive as to a presumption: both decisions predate the 2015 amendment to Rule 37(e). As discussed in Section II, Rule 37(e)(2) allows a court to impose sanctions "**only upon finding** that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2) (emphasis added). The advisory committee notes to the 2015 amendment to Rule 37 explain in detail why this language changed, including:

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. Negligent or even grossly negligent behavior does not logically support that inference.

* * *

51

Similar reasons apply to limiting the court's authority to presume or infer that the lost information was unfavorable to the party who lost it when ruling on a pretrial motion or presiding at a bench trial. **Subdivision (e)(2) limits the ability of courts to draw adverse inferences based on the loss of information in these circumstances, permitting them only when a court finds that the information was lost with the intent to prevent its use in litigation.**

Fed. R. Civ. P. 37(e)(2) advisory committee's notes to the 2015 amendment (emphasis added).

The NAMSA entities cited several cases in a slide presentation provided at the June 28, 2024 hearing to support their argument that a court need not find intent to deprive to find spoliation after the duty to preserve arose. Many of these cases issued before the 2015 amendment to Rule 37(e), do not address the 2015 amendment, imposed sanctions under inherent authority rather than Rule 37(e), or relied on conduct in addition to the destruction of evidence after a duty to preserve arose before relieving a court of its obligation to make a "bad faith" finding. *See, e.g.*, *Gallagher v. Magner*, 619 F.3d 823, 845 (8th Cir. 2010) (stating "a district court does not abuse its discretion by imposing sanctions, even absent an explicit bad faith finding, **where a party destroys specifically requested evidence** after litigation has commenced") (emphasis added); *In re Petters*, 606 B.R. 803, 828, 828 n.221 (Bankr. D. Minn. 2019) (citing *Ramirez-Cruz v. Chipotle Servs., LLC*, No. 15-CV-4514-ADM-KMM, 2017 WL 8947191, at *4 (D. Minn. May 11, 2017), which addressed spoliation sanctions under a court's inherent authority); *Valspar*, 2016 WL 6902459, at *9 (did not address the effect of the 2015 amendment to Rule

37(e)); *see also Evenson v. Johnson Bros. Liquor Co.*, No. 18-CV-3188 (JRT/LIB), 2020 WL 12948541, at *11 (D. Minn. Nov. 12, 2020) (citing *Valspar*).

Further, to the extent these cases permit a court to impose an adverse inference based on timing alone (whether through a "presumption" of bad faith or otherwise), they do not require a court to do so. Indeed, the Eighth Circuit has discussed what is required to find this "serious and specific sort of culpability," explaining in one case that "allegations that incriminating voicemails, emails, and other electronic communications were lost because the city failed to properly search some computers, tablets, and phones; waited too long to search others; and generally failed to take basic steps necessary to find and preserve files that could be relevant to [the plaintiff's] case" only "would at most prove negligence in the city's handling of electronic information, not the sort of intentional, bad-faith misconduct required to grant an adverse presumption." *Auer*, 896 F.3d at 858. The Court considers the timing of the destruction of the USB devices as one factor when determining intent. *See Paisley Park*, 330 F.R.D. at 236 ("Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors.") (cleaned up). But the Court will not use a presumption based on the timing of destruction as a shortcut for making a finding as to intent when there is additional relevant evidence before the Court.

As discussed in Section I.G, *supra*, Pamela and Michael both testified that they were cleaning their house in January 2024, including converting their college-age son's room into a guest room, and they destroyed the USB drives while doing so. (Dkt. 185 at

160:7-161:24; Dkt. 185-1 at 105:16-106:1.)  With this backdrop, the Court turns to the

USB devices accessed by Michael.  Over five days between January 3 and January 14,

2024, Michael connected seven USB devices to his personal HP laptop, two of which

were identified by NAMSA's expert Faulkner as "Card Readers" (apparently docking

stations) and five of which were USB drives for storage.  (Dkt. 185-3 at 15 § IV.A.7; Dkt.

185-1 at 106:18-23.)  Two USB drives were accessed on January 3, two USB drives were

accessed on January 6, and one USB drive was accessed on January 7, 2024.  (Dkt. 185-3

at 15 § IV.A.7.)

        As an initial matter, the Court questions whether there was any duty to preserve

the devices destroyed by Michael, as is required by Rule 37(e).  *See Auer*, 896 F.3d at

858 (finding that the duty to preserve pertains to relevant information).  NAMSA's expert

Faulkner did not state these USB drives contained NAMSA information or that anyone

accessed NAMSA information from them.  (Dkt. 185-3 ¶ 38.)  Michael and Pamela's

expert Lanterman provided a summary of what files were accessed on these USB devices

and opined that "based on the materials that have been provided to me (including my

understanding of what constitutes NAMSA data), there is no evidence to indicate that

these devices were used to store and access NAMSA Confidential Information."  (Dkt.

247 ¶¶ 28-29; *see also* Dkt. 247-1 at 20-22 (list of file names accessed).)  There is no

evidence in the record from which the Court can conclude that the USB drives destroyed

by Michael contained information that "should have been preserved."  The NAMSA

entities also do not identify any evidence demonstrating Michael had the requisite intent

to deprive the NAMSA entities of whatever was on those USB drives when he destroyed

them.  Instead, the NAMSA entities focus on the fact that they were destroyed after

December 13, 2023 and lump the USB drives destroyed by Michael with those destroyed

by Pamela a few days later—after the January 10, 2024 "town hall" meeting.  (*See* Dkt.

153 at 23 (referring to "the now-smashed USB devices"); *id.* at 24 ("As one example . . .

they smashed with hammers numerous USB devices.").

It is true that, as the NAMSA entities argue, no one can be certain what was on

those USB drives because Michael destroyed them.  (*See id.* at 14, 23-25.)  But that can

be true as to ESI deleted by any party in any lawsuit—including NAMSA.  Here, two

USB drives were connected to Michael's laptop on January 3, 2024; two were connected

on January 6, 2024; and one was connected on January 7, 2024.  (Dkt. 185-3 at 15 §

IV.A.7.)  The fact that Michael accessed the USB drives over several days in the

beginning of January 2024 is consistent with Pamela and Michael's explanation that they

were cleaning house in conjunction with redecorating their son's room after his

Christmas break from college.  Nothing about this timing or the manner in which Michael

accessed the USB drives—intermittently over a four-day period in early January 2024—

suggests he was acting in a panic or with the goal of destroying relevant evidence.  For

the Court to conclude both that the USB drives contained information that should have

been preserved and that Michael destroyed them to deprive NAMSA of their information

based solely on the timing of their destruction would amount to the "hindsight" that Rule

37(e) cautions against.  *See* Fed. R. Civ. P. 37(e) advisory committee's notes to 2015

amendment ("Often these events [that give rise to a duty to preserve] provide only limited

information about that prospective litigation, however, so that the scope of information

that should be preserved may remain uncertain.  It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.").  The Court finds that these two requirements of Rule 37(e)(2) are not met as to these USB drives.

As to Pamela, NAMSA's expert Faulkner identified eleven USB devices which had been plugged into Pamela's personal computer, one of which was a "Card Reader" accessed on January 2, 2024 and seven of which were "Other Disks" (e.g., USB drives) accessed on January 11, 2024.[12]  (Dkt. 185-3 at 16 § IV.B.1.)  The NAMSA entities state: "At least one of these drives contained at least nine confidential NAMSA folders on it— relating to biocompatibility, animal care, operations, toxicology cytotoxicity operations, and hemocompatibility—but it is impossible to know how many others."  (Dkt. 153 at 24.)  In addition, one of the SanDisk Cruzer USB drives contained an APS marketing video from 2012 (Dkt. 185 at 162:15-163:23), which appears to be publicly available on YouTube (Dkt. 215 at 31 n.5 (providing YouTube link)).[13]  NAMSA also argues that the evidence on these USB drives "cannot be restored or replaced through additional discovery."  (Dkt. 153 at 25.)

The NAMSA entities argue that Pamela destroyed these USB drives on January 11, 2024 because she had learned about NAMSA's January 10, 2024 "town hall" meeting

---

[12]    The NAMSA entities do not allege spoliation based on the three USB drives plugged in on June 14, 2022; October 14, 2023; and October 24, 2023.

[13]    As of the date of this Order, the YouTube video was publicly available.  *See* https://www.youtube.com/watch?v=Z6ZrPknC1Gk (last accessed November 27, 2024).

regarding its investigation and preparation for litigation.  (*See* Dkt. 296 at 15-16

("Knowing she and Phoenix were implicated in a dispute with NAMSA *and* that

NAMSA was investigating her use of NAMSA information, Ms. Conforti destroyed

seven USB devices on January 11, 2024, two of which she confirmed contained NAMSA

information.").)  They rely on Pamela's Counterclaims and the testimony of Phoenix

Preclinical employee Danielle McCarthy to support this "town hall" theory.  (*See id.*)

But, as explained below, the record does not support the NAMSA entities' claim that

Pamela knew about the investigation based when she destroyed the USB drives.

First, while the Counterclaims state word of this "town hall" meeting "spread

quickly" (Dkt. 142 ¶¶ 35-43), they do not state Pamela or Michael learned of it on or

before January 11, 2024.  Second, McCarthy's testimony as to what Pamela knew about

this meeting and the investigation and when she knew it is ambiguous.  McCarthy

testified that she had heard from NAMSA employees that NAMSA was conducting an

investigation into potential misconduct by Pamela and Michael in "early January of

2024." (Dkt. 298-8 at 115:2-5.)  But McCarthy then testified that she could not recall if

she first heard about the investigation before or after January 19, 2024.  (Dkt. 298-8 at

115:13-17.)  And while McCarthy remembered speaking with Pamela about the

investigation, she did not remember any details of the conversation, including whether

Pamela knew about it before they talked.  (Dkt. 298-8 at 117:5-22.)  The Court finds that

this muddled record does not support the NAMSA entities' argument that Pamela knew

of the January 10, 2024 "town hall" meeting when she accessed and destroyed the USB drives.

In evaluating intent, the Court has also considered the credibility of Michael and Pamela's explanation for why they destroyed USB drives in January 2024. (*See* Dkt. 185 at 160:7-161:24; Dkt. 185-1 at 105:16-106:1 (describing house cleaning after son's visit over Christmas break).) As discussed in connection with Michael, there is nothing about the timing or manner in which he accessed the drives that supports a finding of intent to deprive. And while the NAMSA entities focus on the January 11, 2024 date of Pamela's access, the Court cannot reasonably infer from the record that she knew about NAMSA's "town hall" meeting as of that date.

Other evidence supports Pamela's credibility. Pamela testified that some of the USB drives she disposed of were corrupted and "some didn't have anything of value on them." (Dkt. 185 at 161:22-24, 163:24-164:6.) She testified that she "plugged them all in to see if there was anything in terms of family photos or anything that we would need to retain." (Dkt. 185 at 161:20-22.) Consistent with this testimony, one of the USB drives at issue—a SanDisk Cruzer—found in February 2024 had family photos from a trip to Cabo San Lucas. (Dkt. 185 at 168:8-20.) Pamela also stated in a declaration that two drives contained videos used to prepare a tribute video for her mother's memorial service (Dkt. 217 ¶ 7), which is consistent with the fact that two drives contained .mp4 video files, and two of those files bore women's names as the filename (*see* Dkt. 230 ¶ 47).

As to the eight folders and single file accessed from the Kingston Drive, the NAMSA entities have not disputed that those folders and documents were created in 2012, years before NAMSA acquired APS. (*See* Dkt. 230 ¶ 44 (describing creation date of folders and files); Dkt. 242 ¶ 7 (sale of APS to NAMSA closed on February 26, 2021).) The file and folders' age does not mean they should not have been preserved, but it does support ie disposed of the USB drives because some were corrupted and in her view, "some didn't have anything of value on them." (Dkt. 185 at 161:22-25, 163:24-164:6; *see also* Dkt. 217 ¶ 10 ("I recall viewing the documents [on the Kingston Drive] briefly and determining that they were no longer relevant to anyone.").) Further, the NAMSA entities say that those files either "match" or are "similar" to files on the NAMSA servers. (Dkt 185-3 ¶¶ 42-43; Dkt. 153 at 14; Dkt. 319 at 34:6-7, 110:5-16). This causes the Court to question whether the information contained in those 2012 folders and the file "cannot be restored or replaced through additional discovery" such that Rule 37(e) sanctions are appropriate. *See Lexis-Nexis*, 41 F. Supp. 2d at 955 (declining to award sanctions where, among other things, "the vast majority of the information" on the disk at issue had been preserved on other devices). Further, given the age of the files and the fact that NAMSA appears to have the files or very similar versions of them, the Court finds Pamela's testimony that she did not think APS files from 2012 were of value credible. The same is true for Pamela's decision to dispose of the USB drive containing the APS marketing video from 2012. It is unclear why anyone would need it and if anyone does, it is still available on YouTube.

The NAMSA entities make the point that it is "impossible to know how many other[]" files on the USB drives constitute NAMSA information.  (Dkt. 153 at 24.)  This is a fair point, and the Court does not mean to dismiss it—nor does the Court dismiss the fact that the destruction of the USB drives has limited its ability to determine this fact or whether the USB drives had been plugged into other devices.  Certainly, it is theoretically possible that Pamela and Michael plugged in each USB drive, ascertained that the USB drive contained NAMSA information without actually accessing a folder or file on that USB drive, and disposed of the USB drive so that NAMSA would not discover that fact, perhaps also copying the USB drives to computers or other devices that they also have not produced—and then perjured themselves to cover up their conduct.  But based on the record, the Court finds there is insufficient evidence (circumstantial or otherwise) to support this conclusion or for the Court to reasonably infer as much.  *See Lexis-Nexis*, 41 F. Supp. 2d at 955 ("The moving party must establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the destroyed material would have produced evidence favorable to [their] cause.") (cleaned up).

In sum, based on the Court's careful consideration of the record with respect to Pamela's destruction of these USB drives, there is an insufficient basis for the Court to find that Pamela destroyed the USB drives in January 2024 with the intent to deprive the NAMSA entities of the use of the information they contained.  To the extent the NAMSA entities argue that "bad faith" can be presumed because these USB drives were destroyed after the duty to preserve relevant evidence arose, the Court does not believe presuming that intent to deprive is reasonable in view of Pamela and Michael's credible explanation

for the destruction of these USB devices.  Finally, even if the Court did find the requisite intent, the Court is not persuaded that NAMSA has made enough of a showing to warrant an adverse inference based on the deletion of an APS video from 2012, several APS folders and files from 2012 (which it appears NAMSA has in a very similar form), and speculation about what the other USB devices contained.  *See* Fed. R. Civ. P. 37(e)(2) ("The remedy should fit the wrong, and the severe measures authorized by this subdivision should not be used when the information lost was relatively unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss."); *FA ND CHEV*, 2022 WL 16699304, at *3 ("Alternatively, prejudice does not exist when there is no support for the speculation that the lost evidence would have affected the litigation.") (cleaned up).  The Court denies the Motion as to the USB devices destroyed in January 2024 insofar as it seeks sanctions under Rule 37(e)(2).

NAMSA also makes a cursory assertion that sanctions are appropriate under Rule 37(e)(1).  (Dkt. 153 at 28 n.9 ("Sanctions are also appropriate under Rule 37(e)(1) because NAMSA has suffered prejudice from the Confortis' spoliation of evidence.").)  As to the USB devices, it would be premature to award sanctions under Rule 37(e)(1) because NAMSA has not shown prejudice as to the folders and files on those USB devices.  As of the date of this Order, the YouTube video is publicly available.  And even if the folders and files on the Kingston Drive "cannot be restored or replaced through additional discovery," given their similarity (or matching) to existing NAMSA folders and files, it is hard to see how the NAMSA entities are prejudiced by the disposal of the Kingston Drive for purposes of this lawsuit.

It may be that additional evidence obtained through discovery will support findings of intent to deprive or prejudice. If that is the case, nothing in this Order precludes the NAMSA entities from renewing their motion should they discover such information. But based on the record, and for the reasons stated above, the Court finds that the requisite intent to deprive has not been shown as to the USB devices and that any request for sanctions under Rule 37(e)(1) is premature given the underdeveloped record as to both prejudice and the ability to restore or replace the information through additional discovery. Consequently, the Court denies the Motion—without prejudice—as to the USB devices.

**C.    Michael's Spoliation Related to the Michael Seagate Drive, Western Digital Passport Drive, and 2861 and 5951 Lenovo Computers**

NAMSA also seeks sanctions based on Michael's destruction and wiping of the Michael Seagate Drive, Western Digital Passport Drive, and 2861 and 5951 Lenovo Computers. (Dkt. 153 at 25-26.) For the reasons stated below, the Court finds a sanction under Rule 37(e)(2) in the form of an adverse inference as to Michael based on his destruction of evidence over the weekend of February 2, 2024 is appropriate, but finds that there is no basis at this time for imputing any adverse inference to Pamela or Phoenix Preclinical. The Court also finds that the language of the adverse inference and which parties and claims it applies to should be decided after the close of discovery and after the parties have fully briefed the issues.

### 1.    Michael's Intent

Michael argues that he kept NAMSA information for "nostalgic" purposes, not business purposes, and that he destroyed evidence to prove he never used it for any business purpose rather than suppressing the truth.  (Dkt. 241 at 19-20.)  The first question is not why Michael kept NAMSA information, but whether he destroyed the information on the Michael Seagate Drive, the Western Digital Passport Drive, and the 2861 and 5951 Lenovo Computers with "the intent to deprive another party of the information's use in the litigation."  *See* Fed. R. Civ. P. 37(e)(2).

In the Court's view, there is no doubt that Michael had the requisite intent to deprive with respect to his destruction of evidence over the weekend of February 2, 2024. First, Michael testified:

> **When the lawsuit came to our attention on Friday, I panicked, lost my mind**. This was something that I had on this drive that nobody knew about; not even Pam, my wife. So, at that point in time, **I felt, obviously, not good about having material that I shouldn't have had.** I felt not good about having material that was a secret to my wife, **and knew that, based on her activities, that this was not going to be good for what she was working towards and very excited about in her personal life**.

(Dkt. 185-1 at 61:25-62:9 (emphases added).)  Michael's intent to deprive NAMSA of evidence is further supported by his April 22, 2024 declaration, where Michael states he "deleted these files because he panicked when the lawsuit was filed," in particular because he "was afraid" that Pamela's business, Phoenix Preclinical, "would be wrongfully threatened" by his retention of those files.  (Dkt. 184-3 ¶ 11.)

Michael argued in his brief that the question of intent should be left to the jury. (Dkt. 241 at 20-21.)  However, Madel counsel at the June 28, 2024 hearing made clear

that Michael was not disputing his February 2024 conduct constituted spoliation (although counsel said he still disputes whether his intent was to deprive NAMSA of information) and instead focused on the question of the appropriate remedy.  (Dkt. 319 at 76:20-77:12.)

There is no need for the question of Michael's intent to go to the jury.  Whatever the reason for his panic, it is clear that he deleted, wiped, and disposed of information and devices over the weekend of February 2, 2024 because he did not want the NAMSA entities to know he had NAMSA information and use it in this lawsuit, thus satisfying the intent requirement of Rule 37(e)(2).

## 2.    Prejudice

Michael also argues that no sanctions are required despite his actions because NAMSA has failed to demonstrate prejudice as the result of his actions.  (Dkt. 241 at 21-23.)  Whether the NAMSA entities have shown prejudice as to Michael's February 2024 destruction of evidence does not matter for purposes of Rule 37(e)(2).  *See Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1311 (11th Cir. 2023) ("What's more, Rule 37(e)(2) sanctions do not require any further finding of prejudice.") (marks and citation omitted).  Under Rule 37(e)(2), "the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position."  Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment; *see also Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 736 (9th Cir. 2024) (finding that under Rule 37(e)(2) a finding

64

of intent supports the inference of prejudice, even for the most severe of sanctions, including dismissal).

### 3.    Appropriate Sanctions

Given the finding of spoliation under Rule 37(e)(2), the Court must determine the appropriate remedy.  "If spoliation is determined, the Court has broad discretion in determining an appropriate sanction and considers the culpability of the party and timing of the actions." *Peterson*, 2021 WL 2686119, at *3 (citing *Dillon*, 986 F.3d at 268); *see also In re Petters Co.*, 606 B.R. at 821 ("The imposition of sanctions under Rule 37 is within the Court's discretion.") (citations omitted), *aff'd sub nom. Kelley as Tr. of BMO Litig. Tr.*, 657 B.R. 475.

The NAMSA entities argue that the appropriate sanction for Michael's intentional spoliation is default judgment.  (Dkt. 153 at 30-34.)  "Courts should select the least harsh sanction that can provide an adequate remedy." *Jonathan R. v. Just.*, No. 3:19-CV-00710, 2024 WL 1339522, at *10 (S.D.W. Va. Mar. 28, 2024) (quoting *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. SAG-18-1919, 2023 WL 4669560, at *7 (D. Md. Jan. 23, 2023)).  Indeed, Rule 37's advisory committee's notes state, "Courts should exercise caution, however, in using the measures specified in (e)(2)."  Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment.  "In order to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine, the sanction should be designed to: '(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he or she would have been in absent the wrongful

destruction of evidence by the opposing party.'" *Jonathan R.*, 2024 WL 1339522, at *10

(quoting *Jenkins v. Woody*, No. 3:15CV355, 2017 WL 362475, at *18 (E.D. Va. Jan. 21,

2017)).

The NAMSA entities rely on *Calsep A/S v. Dabral*, 84 F.4th 304, 311-12 (5th Cir.

2023), *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, No. 14-CV-1191 JLS

(KSC), 2019 WL 6527951 (S.D. Cal. Dec. 4, 2019), *OmniGen Rsch. v. Wang*, 321 F.R.D.

367 (D. Or. 2017), and *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp.

1443 (C.D. Cal. 1984), in support of their request for default judgment against Michael.

(Dkt. 153 at 31-32.)  However, the conduct warranting sanctions in these cases not only

involved spoliation, but also the failure of the offending party to follow court orders.  *See*

*Calsep*, 84 F.4th at 310-15; *CrossFit*, 2019 WL 6527951, at *13; *OmniGen Rsch.*, 321

F.R.D. at 371, 373-75; *Wm. T. Thompson*, 593 F. Supp. at 1448-49.  That is not the case

here.

The NAMSA entities also point to what they claim are Michael's attempts to hide

his spoliation during discovery as support for default judgment against him.  (Dkt. 153 at

33.)  Specifically, they argue: "Worse, Dr. Conforti lied under oath about his destruction

of the 2861 Laptop.  When asked if there were any other devices from which he deleted

data relevant to this lawsuit other than his 5951 Computer, the Seagate Drive, and the

Western Digital Drive, Dr. Conforti answered unequivocally, 'No.'"  (Dkt. 153 at

33(citing Dkt. 185-1 at 88:14-20).)  An allegation that a witness lied under oath is

extremely serious, and the Court has thoroughly reviewed the record to evaluate this

assertion.

The cited portion of Michael's April 12, 2024 deposition reads as follows:

Q.    Okay. We've discussed resetting the operating system on your Lenovo computer, your wiping of files from the Seagate hard drive and your wiping of files from the Passport hard drive. Are there any other devices from which you deleted data relevant to this lawsuit?

A.    No, those are the only two devices that I deleted data from or had any data on.

(Dkt. 185-1 at 88:14-21.)

On April 19, 2024, Latham counsel sent a letter to Dorsey and Madel counsel saying "[i]t had come to [Latham counsel's] attention" that Michael had not produced the 2861 Lenovo Computer. (Dkt. 244-1 at 3.) Madel counsel responded on April 22, 2024 by correctly pointing out that Latham counsel had been aware of the 2861 Lenovo Computer and possessed a forensic image of the 5951 Lenovo Computer (described as CFS_2.1) since March 9, 2024, before Michael's deposition, as Latham counsel referenced both in a letter sent on that date. (Dkt. 244-1 at 2; *see also* Dkt. 244-2 at 7 (March 9, 2024 letter).) Then, in a declaration dated April 22, 2024, Michael stated that he was only asked about "a Lenovo computer" and "your Lenovo computer" during his deposition, that NAMSA did not ask him about "specific computers" during his deposition, and that he was not trying to evade the truth during his deposition. (Dkt. 184-3 ¶¶ 5-6.)

The Court agrees that, for whatever reason, the deposition questioning did not specify or differentiate between the two Lenovo computers—even though NAMSA knew at the time of the deposition about the 2861 Lenovo Computer (by serial number) and that there was another Lenovo computer (described as CFS 2_1 in the March 9, 2024

letter).  Moreover, after counsel's question describing Michael's "resetting the operating system" as to "your Lenovo computer" and "wiping" as to the Michael Seagate and Western Digital Passport Drives, counsel asked if Michael had "deleted data" from any other devices and he responded, "those are the only two devices that I deleted data from" (Dkt. 185-1 at 88:14-21)—making it clear that Michael viewed "wiping" as deleting data and "resetting the operating system" on a computer as something different.  Counsel could have asked Michael why he responded that he had deleted data on "only two devices" when he was asked about three, but they did not, indicating they understood the distinction he was making.  In fact, Michael consistently testified that he did not delete data from "the Lenovo computer" because he had only used that computer to transfer files and he distinguished between deleting data and resetting an operating system.[14] (Dkt. 185-1at 78:1-21; 82:2-17.)  Michael's declaration as to the 2861 Lenovo Computer is consistent with this testimony.  (Dkt. 184-3 ¶ 7 ("I did not put any data on this Computer.  I used it only as a passthrough to move documents from the 5-terabyte Seagate hard drive to the Western Digital Passport external hard drive (forensic images of both of which have been produced to NAMSA in this litigation).").)  The NAMSA entities' assertion that Michael "lied under oath" relies on imprecise questioning and ignores the difference between deleting data and resetting an operating system—which

---

[14]    The Court recognizes that resetting an operating system does delete data of a kind; the point is that—as the NAMSA entities know—Michael distinguished between resetting and deleting during his testimony.

they knew Michael thought was meaningful based on his testimony—and is otherwise unsupported.[15]

To return to the point of the Motion, the Court finds that Michael should be sanctioned under Rule 37(e)(2) for his destruction of evidence over the February 2, 2024 weekend, and that the appropriate sanction is an adverse inference. However, the Court also finds that the language of the instruction, including which claims and parties it applies to, should be decided after the close of discovery and the parties have fully briefed the issue. This is for several reasons. First, the NAMSA entities originally sought very specific adverse inferences as to Michael and Pamela. (Dkt. 153 at 29-30.) Not until the June 28, 2024 hearing did they seek a more general adverse inference. (*See* Dkt. 319 at 46:3-48:10, 76:5-11.) In response, the Confortis objected to the last-minute revision and stated their belief that the language of any adverse inference instruction should wait until the close of discovery. (Dkt. 319 at 71:3-22, 81:4-15.) At this point, given the NAMSA entities' shifting positions as to the adverse inference instruction and "the fact that discovery is still on-going, the record is not yet closed, and the case is still some time from trial, the Court believes it more appropriate to defer consideration of those sanctions to a later date, closer to trial." *Paisley Park*, 330 F.R.D. at 237; *see also Monarch Fire Prot. Dist. of St. Louis Cnty.*, 644 F.3d at 639 ("Here, the district court withheld ruling on Monarch's Rule 37 motion for sanctions until the case proceeded to

---

[15]    The Court expects a party or lawyer who accuses a witness of lying under oath to be able to fully support this serious allegation—which the NAMSA entities have not done here.

trial, noting that the appropriate sanction for Indellicati's actions would likely be an adverse inference jury instruction.").

There is another reason the Court thinks it appropriate to defer crafting the language of any adverse inference instruction. The NAMSA entities ask the Court to extend any adverse inference as to Michael against Pamela and Phoenix Preclinical. (*See, e.g.*, Dkt. 153 at 29 (asking for adverse inference that "Dr. Conforti misappropriated NAMSA's confidential, proprietary, and trade secret information for prohibited purposes, **including to support the competitive business of Phoenix**") (emphasis added); Dkt. 319 at 51:1-4, 51:11-52:13 (arguing at June 28, 2024 hearing for imputation of any adverse inference as to Pamela and Phoenix Preclinical).) The problem is that the NAMSA entities have not identified any real legal or factual basis for doing so.

As to the law, the NAMSA entities supported their imputation argument at the June 28, 2024 hearing with citations to *Vogt v. MEnD Corr. Care, PLLC*, No. 21-CV-1055 (WMW/TNL), 2023 WL 2414551 (D. Minn. Jan. 30, 2023), and *Woods v. Scissons*, No. CV-17-08038-PCT-GMS, 2019 WL 3816727 (D. Ariz. Aug. 14, 2019). Both of these cases rely on agency principles in the employment context. *See Vogt*, 2023 WL 2414551, at *14 ("The CO Defendants are in a similar special relationship with the County based on their employment. The CO Defendants are represented by the same counsel as the County."); *Wood*, 2019 WL 3816727, at *6 (imputing liability for spoliation of non-party police department to employee police officer). Other courts have analyzed imputation of spoliation under agency principles. *See, e.g.*, *Danielson*, 2021 WL 217706, at *6 n.7 ("Courts ordinarily analyze the attribution of fault to one party for

another's spoliation under principles of agency"); *Am. Builders & Contractors Supply*, 2012 WL 2992627, at *6 ("The Court agrees that general agency principals [sic] apply in determining whether to impose sanctions against a party for spoliation by its employees.").

Here, the NAMSA entities have not articulated any agency theory that would apply to Pamela and Michael. They suggest that their marital relationship and business relationship at APS means that Michael **must** be providing advice and counsel to Pamela with respect to Phoenix Preclinical. But Pamela has denied under oath that he has done so or is doing so. (Dkt. 185 at 109:5-112:20.) The NAMSA entities have offered no evidence to the contrary—not from Michael and Pamela's depositions, not from their emails or Pamela's text messages, not from their personal laptops examined by Faulkner, and not from the deposition of Phoenix Preclinical employee McCarthy. The Court finds that the record at this time does not support imputing liability for Michael's February 2024 conduct to Pamela and Phoenix Preclinical.

The NAMSA entities also have offered no evidence that Pamela told Michael to destroy or wipe the Michael Seagate Drive, the Western Digital Passport Drive, or the Lenovo Computers or that she knew of and agreed with his decision to engage in any of that conduct. Based on the record, Pamela was in Illinois with her father, who was undergoing cancer treatment, during the weekend of February 2, 2024, when Michael engaged in this conduct. (Dkt. 242 ¶ 31.) Michael stated under penalty of perjury that Pamela had no role in his activities during the weekend of February 2, 2024 and Pamela stated under penalty of perjury that she did not hear about Michael's actions until she

returned to Minnesota from assisting her father, on February 5, 2024.  (Dkt. 242 ¶ 31; Dkt. 217 ¶ 15.)  Indeed, it is unclear whether the NAMSA entities are taking the position that Michael and Pamela are lying, or if they simply believe that Pamela and Phoenix Preclinical should be liable for Michael's conduct because Pamela and Michael are married and because Michael admitted he was trying to protect Pamela and Phoenix Preclinical.  If the latter is NAMSA's position, it is not supported by any authority.  It goes too far to impute Michael's bad conduct to Pamela—even if he was doing it for her—absent Pamela's agreement or acquiescence in such conduct.

Let there be no question as to how the Court views Michael's intentional destruction of evidence over the weekend of February 2, 2024.  His conduct is incredibly serious, not to mention harmful to the administration of justice, and requires a sanction that commensurate with the damage he has caused—in this case, an adverse inference.  *See TLS Mgmt. & Mktg. Servs., LLC v. Mardis Fin. Servs., Inc.*, No. 3:14-CV-00881-CWR-LRA, 2018 WL 3673090, at *1 (S.D. Miss. Jan. 29, 2018) ("A court does justice by finding truth.  That search requires evidence.  Intentionally destroying evidence, then, is more than a devious litigation strategy but a lethal attack on a court's purpose and must be responded to in kind.").  But as other courts have recognized, an adverse inference is often a litigation-ending device that should not be given lightly.  *Rao*, 631 F. Supp. 3d at 712.  The Court finds that the language of the adverse inference should be determined after the close of discovery and after the parties have had the opportunity to fully brief the adverse inference instruction.  For these reasons, the Court finds Michael intentionally spoliated evidence on February 2 to 4, 2024 and should be sanctioned for that conduct,

but also finds that the language of that adverse inference—and to which parties and claims it should apply—should be decided after the close of discovery and after all parties have had a fair opportunity to make arguments.

## D.  Michael's iPhone Texts

Finally, the NAMSA entities seek sanctions due to "Dr. Conforti's thousands of deleted text messages."  (Dkt. 153 at 27.)  This appears to be an exaggeration, apparently based on NAMSA's expert Faulkner statement that Michael's iPhone had sent/received approximately 44,000 text messages "between **April 16, 2023 when the phone was first put into use** and February 13, 2024, when the phone was turned in."  (Dkt. 185-3 ¶ 34 (emphasis added).)  Based on Faulkner's review, one chat thread had an artifact showing that the most recent text message was sent on February 2, 2024 and two other chat threads had artifacts showing their most recent message was sent on February 10, 2024.  (Dkt. 185-3 ¶ 35.)  "A total of 25 chat threads" (including those three) had artifacts indicating their most recent message was sent after December 13, 2023.  (Dkt. 185-3 ¶ 35.)  From this, Faulkner could conclude that those chat threads had been deleted after the date of the most recent message, e.g., that the 25 chat threads had been deleted on or after December 13, 2023.[16]  (*See id.* ¶¶ 35-37.)  According to Faulkner: "The exact date and time when text messages were deleted is unknown."  (Dkt. 185-3 ¶ 35.)

Michael testified that "[t]here shouldn't have been any text messages on [his] phone" because he deletes his text messages after he receives a text, and this has

---

[16]    It is unclear to the Court if other text messages (perhaps not a part of chat threads) were deleted after December 13, 2024 or after February 2, 2024.

"always" been his practice.  (Dkt. 185-1 at 89:7-90:20; *see also* Dkt. 242 ¶ 35.)  He further testified that he did not delete any text messages during the period he was panicked about this lawsuit (that is, February 2 to 4, 2024).  (Dkt. 185-1 at 90:21-24.)

NAMSA argues that even accepting that it was Michael's practice to delete his iPhone texts on a regular basis, it is not credible that he maintained this practice in good faith once he was made aware of this litigation and when he was panicking and destroying other evidence.  (Dkt. 153 at 27.)  Michael should have stopped deleting his text messages—to the extent they contained information that should have been preserved in anticipation of this lawsuit—as of December 2023.  *See Kelley as Tr. of BMO Litig. Tr.*, 657 B.R. at 487.  But there are several problems with awarding sanctions under Rule 37(e)(2) at this time.

First, the NAMSA entities have not made any showing that the deleted text messages are not available from the persons who sent and received them—including Pamela.  Thus, it is unclear whether they "cannot be restored or replaced through additional discovery."  *See* Fed. R. Civ. P. 37(e).  Second, the NAMSA entities try to show intent to deprive based on Michael's destruction of evidence over the February 2, 2024 weekend, but the Court finds this reasoning insufficient given the undisputed evidence that Michael regularly deleted his text messages before NAMSA filed this lawsuit.  Further, the forensic evidence does not show any message was deleted during the weekend of February 2, 2024, when Michael was panicking.  At this point, Michael's conduct with respect to text messages appears more akin to negligence or gross negligence, which will not support a finding of intent under Rule 37(e)(2).  For these

74

reasons, the Court declines to find Michael intended to deprive the NAMSA entities of these text messages and will not award sanctions under Rule 37(e)(2) based on their deletion.

The NAMSA entities also claim in a fairly conclusory fashion that they are entitled to sanctions under Rule 37(e)(1) because they have suffered prejudice due to the destruction of evidence. (Dkt. 153 at 28 n.9; Dkt. 296 at 19.) Again, they have not even shown Michael's text messages are not recoverable from the persons who sent and received them, whether Pamela, Jorgenson, Markuson, or others. *See* Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment; *Kramer*, 2016 WL 7163084, at *2 (rejecting sanctions under Rule 37(e)(1) where information can be restored or replaced through additional discovery). The NAMSA entities have also made little to no argument as to how they are prejudiced by the messages' deletion. *See FA ND CHEV*, 2022 WL 16699304, at *3 ("Depending on the nature of the evidence lost, prejudice may be shown merely by how impactful the evidence is determined to be. Prejudice likely exists from lost or destroyed ESI if the lost or missing evidence would be different or more helpful to the party claiming spoliation than the evidence already in existence. Alternatively, prejudice does not exist when there is no support for the speculation that the [lost] evidence would have affected the litigation.") (cleaned up). And nowhere do the NAMSA entities set forth for the Court what sort of sanctions are appropriate under Rule 37(e)(1). They do not even seek sanctions under Rule 37(e)(1) in their proposed order. (Dkt. 157.) This confirms that awarding Rule 37(e)(1) sanctions based on a partial record and the NAMSA entities' abbreviated argument would be premature.

75

**E.      Sanctions Pursuant to the Court's Inherent Authority**

The NAMSA entities also ask the Court to award sanctions pursuant to its inherent authority.  (Dkt. 153 at 30.)  The Court declines to award sanctions or find spoliation outside the bounds of Rule 37 at this time for two reasons.  First, "[t]he exclusive nature of Rule 37(e) sanctions for the loss of ESI has been widely recognized." *Alsadi*, 2020 WL 4035169, at *3 (collecting cases).  While the Court could rely on its inherent authority if it believed Rule 37(e) was insufficient to decide this Motion, nothing suggests Rule 37(e) is not "up to the task." *See Schlafly*, 970 F.3d at 936 (cleaned up).  Second, given that discovery is not complete and the Court's findings that there is no showing of intent to deprive as to the USB devices and Michael's text messages, not to mention the incomplete record as to prejudice and whether some of the evidence at issue can be restored or replaced through additional discovery, it would be premature to award sanctions under the Court's inherent authority.

## IV.    ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT**: Plaintiffs North American Science Associates, LLC and NAMSA Holdco, LLC's Motion for Sanctions Against Defendants Michael Conforti and Pamela Conforti for Evidence Spoliation (Dkt. 151) is **GRANTED IN PART AND DENIED IN PART** as follows:

1.      The Motion is **GRANTED** insofar as the Court finds Defendant Michael Conforti should be sanctioned under Federal Rule of Civil Procedure 37(e)(2) in the form of an adverse inference for his destruction of evidence relating to the Michael Seagate

Drive, Western Digital Passport Drive, and the 2861 and 5951 Lenovo Computers over the weekend of February 2, 2024, with the language of the adverse inference and to which parties and claims it applies to be decided after discovery is complete and the parties have had the opportunity to brief the issue; and

2.    The Motion is otherwise **DENIED** without prejudice.

DATED: November 27, 2024                 *s/Elizabeth Cowan Wright*
                                                              ELIZABETH COWAN WRIGHT
                                                              United States Magistrate Judge